**Order filed June 14, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-17-00575-CV

**GRACIE NGUYEN; PATRICK SANCHEZ; TAMARA AND DERRICK O'NEAL, INDIVIDUALLY AND AS REPRESENTATIVES OF THE ESTATE OF DE'ANDRE TATUM, DECEASED; ERICA D. HALL; CURTISHA DAVIS; ARTHUR ZAMARRIPA, AS NEXT FRIEND OF A.Z.; AND WLLLAM JOSMA, Appellants**

**V.**

**SXSW HOLDINGS, INC.; SXSW LLC; PATRICK LOWE; TRANSPORTATION DESIGN CONSULTANTS; AND THE CITY OF AUSTIN, Appellees**

On Appeal from the 261st District Court
Travis County, Texas
Trial Court Cause No. D-1-GN-17-002229

## O R D E R

The clerk's record was filed August 25, 2017. Our review has determined that relevant items have been omitted from the clerk's record. *See* Tex. R. App. P. 34.5(c).

In an order issued June 4, 2019, we directed the Travis County District Clerk to file a supplemental clerk's record containing **Plaintiff William Josma's Amended Petition filed March 15, 2016 in cause number D-1-GN-16-001142**. A supplemental clerk's record was filed on June 4, 2019, but it does not contain the requested document.

Accordingly, the Travis County District Clerk is directed to file a supplemental clerk's record on or before **June 21, 2019** containing the **Plaintiff William Josma's Amended Petition filed March 15, 2016 in cause number D-1-GN-16-001142**. A copy of the requested document is attached to this order.

If the omitted item is not part of the case file, the district clerk is directed to file a supplemental clerk's record containing a certified statement that the omitted item is not a part of the case file.

PER CURIAM

3/15/2016 3:38:25 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-16-001142
Nancy Rodriguez

CAUSE NO. D-1-GN-16-001142
CONSOLIDATED CAUSE NO. D-1-GN-14-005295 (*Nguyen v. SXSW Holdings Inc.*)

| | | |
|---|---|---|
| WILLIAM JOSMA, | § | IN THE DISTRICT COURT OF THE |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 250th JUDICIAL DISTRICT |
| | § | |
| SXSW HOLDINGS, INC., SXSW LLC, | § | |
| PATRICK LOWE, | § | |
| TRANSPORTATION DESIGN | § | TRAVIS COUNTY, TEXAS |
| CONSULTANTS LLC, CITY OF | § | |
| AUSTIN, CLUB 1808, ANDREW | § | |
| BRAMWELL and RASHAD OWENS, | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S FIRST AMENDED PETITION

**Hendler Lyons Flores, PLLC**
1301 W. 25th Street,
Austin, Texas 78705
Telephone: 512-439-3202
Facsimile: 512-439-3201
www.hendlerlaw.com

Scott M. Hendler
Texas Bar No. 09445500
shendler@hendlerlaw.com

Sean M. Lyons
Texas Bar No. 00792280
slyons@hendlerlaw.com

Rebecca Ruth Webber
Texas Bar No. 24060805
rwebber@hendlerlaw.com

**ATTORNEYS FOR PLAINTIFF**

Unofficial copy Travis Co. District Clerk Velva L. Price

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................... 1

II. PARTIES ........................................................................................................... 1

III. DISCOVERY CONTROL PLAN ...................................................................... 3

IV. JURISDICTION ................................................................................................ 3

V. VENUE ............................................................................................................. 3

VI. BACKGROUND AND STATEMENT OF FACTS ........................................... 4

    A. SXSW: History, Size and Revenues ......................................................... 4

    B. Errant vehicle collisions are a pervasive, well-publicized, and foreseeable risk, making the 2014 SXSW crash a preventable tragedy. ........................... 6

        1. Traffic control regulations establish standards for protecting pedestrians and cyclists from traffic around special events. .................. 9

        2. The 2004 National Transportation Safety Board investigation of the Santa Monica Farmer's Market Crash ............................................. 14

        3. The May 2012 errant vehicle collision on the Austin Hike and Bike Trail in downtown Austin ............................................................ 17

        4. The July 2012 errant vehicle into Lady Bird Lake in downtown Austin ............... 18

        5. The October 2012 errant vehicle incident on Sixth Street in downtown Austin .... 19

        6. The March 2013 errant vehicle hit-and-run during the SXSW festival in downtown Austin ................................................................ 20

        7. The City of Austin's *2012 Traffic Fatality Report* ......................... 20

        8. The SXSW Defendants' February and March 2014 emails regarding rigid, water-filled barriers .................................................. 23

        9. The March 2014 tabletop exercise wherein first responders and SXSW planners trained for a potential errant vehicle incident ........... 24

       10. Rigid, water-filled barriers are a ubiquitous sight throughout Austin's Central Business District. ............................................................ 24

    C. Excessive alcohol consumption and drunk driving in and around the SXSW festival zone should be well known to SXSW .................................. 25

        1. Austin is number one for alcohol consumption in Texas. ................. 25

        2. Excessive DWI and PI arrests each year at SXSW demonstrate why SXSW and the City of Austin should have anticipated the risk of intoxicated drivers and errant vehicles. ..................................... 26

    D. Other factors should have compelled SXSW to guard against errant vehicles. .......... 29

        1. SXSW had superior knowledge of the risk posed by errant vehicle collisions. ..... 29

        2. It would not have been onerous for SXSW to secure festival areas from errant vehicular traffic. .................................................... 31

Unofficial copy Travis Co. District Clerk Velva L. Price

ii

3.    SXSW's Right-of-Way permit gave SXSW legal possession and control of the street where the crash occurred. ..............................................................32

E.    The City of Austin's *2014 SXSW Post-Event Evaluation*......................................33

F.    The events of the early morning hours of March 13, 2014...............................34

VII.    CAUSES OF ACTION ........................................................................................35

**Count 1.** Negligence by the SXSW Defendants ...............................................35

1.    Duty - The SXSW Defendants owed William a duty to exercise reasonable care to avoid a foreseeable risk. ...........................................................................35
2.    Breach - The SXSW Defendants breached their duty to William. .........................39
3.    Proximate Cause - The SXSW Defendants' failure to exercise ordinary care proximately caused injuries to William.............................................................40
4. Gross Negligence – The SXSW Defendants were grossly negligent. ...................43

**Count 2.** Negligence by the City of Austin..................................................43

1.    The City of Austin performed a proprietary function by sponsoring the SXSW festival. ...................................................................................................44
2.    Duty – The City of Austin owed William a duty to exercise reasonable care to avoid a foreseeable risk. ...........................................................................44
3.    Breach – The City of Austin breached its duty to William..................................48
4.    Proximate Cause - The City of Austin's failure to exercise ordinary care proximately caused William's injuries.............................................................49
5.    Gross Negligence - The City of Austin was grossly negligent..............................52

**Count 3.** Negligence Per Se by the SXSW Defendants .......................................53

1.    The City of Austin Ordinance governing temporary street closures for festivals was designed to protect William. .......................................................................53
2.    Tort liability may be imposed under the Ordinance governing temporary street closures for festivals.................................................................................53
3.    The SXSW Defendants' violation of the Ordinance proximately caused William's injuries.................................................................................................54
4.    Gross Negligence - The SXSW Defendants were grossly negligent......................56

**Count 4.** Negligent Voluntary Undertaking by the SXSW Defendants...............................56

1.    The SXSW Defendants owed a legal duty to William. .......................................56
2.    The SXSW Defendants breached their legal duty to William ...............................58
3.    The SXSW Defendants' negligent performance of their voluntary undertaking increased William's risk of harm. .................................................................58
4.    William relied on the SXSW Defendants' traffic control measures.......................59

5. The SXSW Defendants' negligence proximately caused A.Z's injuries. ............... 59
6. Gross Negligence – The SXSW Defendants were grossly negligent. .................. 60

**Count 5.** Premises Liability of the SXSW Defendants ................................................ 60

1. The SXSW Defendants were the temporary occupiers of the premises at the time of the incident. ......................................................................................... 60
2. The condition created by the SXSW Defendants' failure to deploy adequate traffic control measures posed an unreasonable risk of harm to festivalgoers. ................ 61
3. The SXSW Defendants had actual knowledge of the dangerous condition. .......... 61
4. The SXSW Defendants knew or should have known the dangerous condition posed an unreasonable risk to William. ........................................................................ 62
5. The SXSW Defendants breached their legal duty to William by failing to reduce, eliminate, or warn of the risk of an errant vehicle. ............................................. 64
6. The SXSW Defendants' breach proximately caused William's injuries and the Plaintiff's damages. ........................................................................................... 64

**Count 6.** Public Nuisance by the SXSW Defendants .................................................. 65

1. The SXSW Defendants' conduct was a public nuisance. ..................................... 65
2. William has common-law standing to bring a public nuisance cause of action. ..... 65

**Count 7.** Negligent Hiring, Supervision, Training, and Retention by SXSW ................ 66

1. Duty.......................................................................................................... 66
2. Breach ....................................................................................................... 66
3. Proximate Cause ......................................................................................... 68
4. Gross Negligence ....................................................................................... 68

**Count 8.** Negligence of Club 1808................................................................................ 69

1. Duty – Club 1808 owed a legal duty to William. ............................................. 69
2. Breach – Club 1808 breached its legal duty to William. .................................... 70
3. Causation – Club 1808's breach of it legal duty to William was a cause William's injury ....................................................................................................... 70
4. Gross Negligence – Club 1808 was grossly negligent........................................ 70

**Count 9.** Negligent Entrustment by Andrew Bramwell................................................. 70

1. Duty – Andrew Bramwell owed a legal duty to William. ................................... 70
2. Breach - Andrew Bramwell breached his legal duty to William. .......................... 71
3. Causation - Andrew Bramwell's breach of his legal duty to William was a cause of William's injuries. ....................................................................................... 71
4. Gross Negligence - Andrew Bramwell was grossly negligent. ............................ 71

**Count 10.** Negligence by Rashad Owens........................................................................ 71

     1.     Duty - Rashad Owens owed a legal duty to William..............................72

     2.     Breach - Rashad Owens breached his legal duty to William.............................72

     3.     Causation - Rashad Owens' breach of his legal duty to William. was a cause of William's injuries. ........................................................................................ 72

     4.     Gross Negligence - Rashad Owens was grossly negligent. .................................... 72

VIII.    DAMAGES ................................................................................................ 73

IX.      DEMAND FOR JURY TRIAL ................................................................ 73

X.        PRAYER .................................................................................................. 74

## LIST OF EXHIBITS

Exhibit 1. SXSW.com – "First Timer's Guide"

Exhibit 2. Documents showing unreimbursed public safety costs for the 2014 SXSW festival

Exhibit 3. SXSW.com – "See Showcasing Bands in Your Hotel"

Exhibit 4. City of Austin, *2014 SXSW Post-Event Evaluation*

Exhibit 5. Austin Police Department arrest data and collision statistics for George Sector during SXSW festivals 2009-2014

Exhibit 6. Federal MUTCD – rigid barriers

Exhibit 7. Advertisements for rigid barriers and pallet jack

Exhibit 8. Texas MUTCD – rigid barriers

Exhibit 9. City of Austin Transportation Criteria Manual

Exhibit 10. 804 Series Standard Details

Exhibit 11. NTSB Highway Accident Report: Vehicle Intrusion Into Pedestrian Space at Santa Monica Farmer's Market

Exhibit 12. *Austin officials seek permanent trail safety barriers on Cesar Chavez*, AUSTIN AMERICAN-STATESMAN (July 13, 2014)

Exhibit 13. Julie Change, *Lustre Pearl to pay $40,000 fine after patron's death*, AUSTIN AMERICAN-STATESMAN (Oct. 9, 2013)

Exhibit 14. Wells Dunbar, *No Charges for Driver Shot at by Police While Fleeing Sixth Street*, KUT (Oct. 23, 2012)

Exhibit 15. David Barer, *Seven-figure lawsuit filed in 2013 SXSW hit-and-run*, KXAN (March 18, 2015)

Exhibit 16. City of Austin, *2012 Traffic Fatality Report*

Exhibit 17. Emails including email from Defendant Lowe to SXSW Community Liaison Christian Mella and Nick Brown (Feb. 12, 2014)

Exhibit 18. Emails including email from Brad Spies (Feb. 28, 2014)

Exhibit 19. Emails including email from Defendant Lowe to Victor Pena (February 27, 2014)

Exhibit 20. Email from Defendant Lowe to Brad Spies (March 1, 2014)

Exhibit 21. Eric Dexheimer, *SXSW crash: One Tragic Night. One Year Later: 'I saw a lot of bystanders just running and screaming and crying'*, AUSTIN AMERICAN-STATESMAN (March 13, 2015)

Exhibit 22. Photographs of rigid barriers throughout the Central Business District

Exhibit 23. Traffic Control Plan

Exhibit 24. Gary Dinges, *Does Austin have a drinking problem?*, AUSTIN AMERICAN-STATESMAN (March 15, 2014)

Exhibit 25. *Americas Drunkest Cities of 2011*, THE DAILY BEAST (Dec. 28, 2011)

Exhibit 26. Andrew Weber, *The Top 10 Austin Top 10 Lists*, KUT (April 22, 2013)

Exhibit 27. W. Gardner Selby, *Austin police chief says Texas leads nation in drunk driving deaths*, KVUE (Nov. 18, 2010)

Exhibit 28. Right-of-Way Permit Application

Exhibit 29. Map of the "George Sector"

Exhibit 30. Texas Board of Professional Engineers – search for "Patrick Lowe"

Exhibit 31. Right-of-Way Permit

Exhibit 32. City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Events

## I.     INTRODUCTION

1.     William Josma brings this lawsuit against SXSW Holdings, Inc. and SXSW LLC, the two for-profit companies that own and operate the SXSW music festival;; Patrick Lowe, SXSW's traffic design consultant who was designated as the person responsible for SXSW's street closures; Mr. Lowe's company, Transportation Design Consultants, LLC; the City of Austin; Club 1808, the bar that served Rashad Owens when he was already intoxicated and allowed Mr. Owens to smoke marijuana on its premises; Andrew Bramwell, the man who gave the clearly intoxicated Rashad Owens the keys to his car; and Rashad Owens, the driver of the vehicle that collided with SXSW attendees.

2.     The SXSW crash of March 13, 2014 was a preventable tragedy. It was foreseeable and predictable that an errant vehicle (whether driven by a drunk driver, a tired driver, or an elderly and confused driver) might drive into the cordoned-off area on Red River Street because there are 20,000 errant vehicle incidents in the United States each year. The owners, planners, and organizers of a downtown urban music festival should have recognized that risk given their nearly three decades of experience holding the festival. If SXSW, Mr. Lowe, Transportation Design Consultants, and the City of Austin had adhered to industry standards and utilized adequate traffic control measures, WILLIAM would not have been hit by a car, injured, and traumatized as a result.

## II.     PARTIES

3.     Plaintiff WILLIAM JOSMA is an individual and a resident of Austin, Texas.

4.     Defendant SXSW HOLDINGS, INC. (formerly known as SXSW, INC.) is a corporation duly organized and existing under the laws of the State of Texas, with its principal place of business in the State of Texas. This Defendant has been served.

1

Unofficial copy Travis Co. District Clerk Velva L. Price

5. Defendant SXSW, LLC (formerly known as SXSW Transition, LLC) is a limited liability company duly organized and existing under the laws of the State of Texas, with its principal place of business in the State of Texas. This Defendant has been served. SXSW Holdings, Inc. and SXSW, LLC will be referred to collectively in this petition as "SXSW".

6.

7. Defendant Patrick Lowe is an individual and a citizen of the State of Texas. This Defendant has been served.

8. Defendant Transportation Design Consultants, LLC is a limited liability company duly organized and existing under the laws of the State of Texas, with its principal place of business in the State of Texas. This Defendant has been served. Mr. Lowe, Traffic Transportation Consultants, LLC, , and the SXSW entities will be referred to collectively in this petition as "the SXSW Defendants."

9. Defendant the City of Austin is a Texas municipality and it may be served through its Mayor, Steve Adler, at 301 W. 2nd Street, Austin, Texas 78701.

10. Defendant 1808 East 12th LLC d/b/a Club 1808 is a Texas Limited Liability Corporation and may be served through its registered agent Gene A. Mays at 14508 Cottingham Drive, Austin, Texas 78725.

11. Defendant Andrew Bramwell is an individual and a citizen of the State of Texas. He may be served at his residence which is located at 15455 Point Northwest Blvd # 1006, Houston, Texas 77095.

12. Defendant Rashad Owens is an individual and a resident of the State of Texas. This Defendant has been served.

### III. DISCOVERY CONTROL PLAN

13.     Pursuant to Tex. R. Civ. P. 190.1 and 190.4, Plaintiff intends to conduct discovery under a Level 3 Discovery Control Plan.

### IV. JURISDICTION

17.     This Court has subject matter jurisdiction over this lawsuit because the amount in controversy exceeds the minimum jurisdictional requirements.

18.     This Court has personal jurisdiction over Defendants because each Defendant (1) engages in, and transacts business within, the State of Texas, (2) maintains continuous and systematic contacts with the State of Texas, (3) purposefully avails itself to the laws of the State of Texas, (4) committed torts, in whole or in part, in the State of Texas against a Texas resident, and (5) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Texas and involved each one of said Defendants.  Defendants SXSW Holdings, Inc., SXSW, LLC, Patrick Lowe and Transportation Design Consultants are citizens of Texas and committed torts in Texas.  Defendant Rashad Owens committed a tort in Texas and is present in the forum.

### V. VENUE

19.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a), venue is proper in Travis County, Texas because (1) all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Travis County, Texas, and (2) some or all of the Defendants resided in Travis County, Texas at the time Plaintiff's causes of action accrued.

20.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.005, because venue is proper in Travis County, Texas as to at least one Defendant, venue is proper in Travis County, Texas as to all Defendants.

Unofficial copy Travis Co. District Clerk Velva L. Price

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

A.  <u>SXSW: History, Size and Revenues</u>

21.     Beginning in March 1987, and continuing every year in March since, the City of Austin, Texas is the site of one of the largest music festival of its kind in the world – South by Southwest (SXSW). In 2014, the music portion of the festival alone drew over 28,000 credentialed badge holders who came to hear more than 2,000 bands, attend conferences, and network with other members of the music industry from around the world. According to the festival's website, "SXSW is more than just a conference. You'll be attending sessions, meeting potential clients, attending screenings, networking at clubs, and hopping from one showcase to the next."[1]

22.     SXSW began as an obscure music festival with approximately 700 participants. Over the last 27 years, it has mushroomed into a world-renowned event comprised of a film component, an interactive component, and a live music component. The festival attracts attendees and participants from multiple countries. In 2014, approximately 80,000 registered participants descended on Austin to attend various parts of the festival. In addition, SXSW issued more than 150,000 guest passes and drew a record-setting total festival attendance. In addition, upwards of 100,000 additional people participate without official credentials.

23.     In 2014 the cost for attending the SXSW music festival ranged from $625 to $1695. For this fee, registrants received festival credentials that allowed them access to the SXSW music venues. While the festival admittedly generates substantial economic benefit for a discrete segment of the Austin economy, SXSW produces substantial profits for its owners. The

---

[1] "First Timer's Guide" screen shot, attached as **exhibit 1**.

SXSW festival is owned by SXSW Holdings. The owners of SXSW Holdings include Roland Swenson and Louis Black. In 2012, the owners of SXSW Holdings established SXSW, LLC. SXSW Holdings is the managing member of, and controls, SXSW, LLC. Both of these entities are private, for-profit companies.

24.     SXSW's 2014 revenues from the sale of credentials to attend only the music portion of the festival far exceeded ten million dollars. Despite total annual revenues in the tens of millions of dollars, SXSW applies for—and receives—hundreds of thousands of dollars in fee waivers from the City of Austin.[2] SXSW does not fully reimburse the citizens of Austin for the fees for services such as extra police, fire, and EMS costs that the City of Austin ordinarily requires other event organizers to pay. In addition, SXSW keeps its overhead low by taking advantage of a largely volunteer workforce enticed by the lure of access to the official SXSW events.

25.     Unlike most other music festivals, such as the Austin City Limits Music Festival held within the confines of Zilker Park or numerous jazz festivals held around the world in discrete locations, SXSW does not take place at a single, dedicated location; instead the festival takes place simultaneously at almost 100 official SXSW designated venues throughout the City.[3] The nearly 100 official SXSW music venues for the 2014 festival included hotels, churches and festival centers, as well as numerous bars. For 2014, SXSW published a detailed schedule of festival music "showcases" taking place − often between 9 p.m. and 2 a.m. − at the dozens of official SXSW bar venues throughout Austin, including at no less than 10 official venues on Red River Street.

---

[2] Documents showing unreimbursed public safety costs for the 2014 SXSW festival, attached as **exhibit 2**.
[3] Screen shot of "See Showcasing Bands in Your Hotel", available at http://sxsw.com/music/news/2014/2nd-play-stages-see-showcasing-bands-your-hotel, attached as **exhibit 3**.

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

26.	According to the City of Austin's *2014 SXSW Post-Event Evaluation*, SXSW has become a "Spring Break destination" where "crowd management is worsening," "alcohol consumption [has become] a major issue," "many venues operate at or near capacity," "many of the events [are] ill-planned" and SXSW's "lack of coordination with [Austin Center for Events] prior to events results in public safety personnel having to react to situations rather than a safer, pro-active event management mode."[4]

27.	To take in as many SXSW band performances as possible, or to see the desired mix of bands, festivalgoers were encouraged to travel all over Austin's Central Business District from one official SXSW venue to another. By downloading an app and following the directions on their smartphones, SXSW attendees would be, as SXSW described it, "networking at clubs, and hopping from one showcase to the next."[5]

**B.	Errant vehicle collisions are a pervasive, well-publicized, and foreseeable risk, making the 2014 SXSW crash a preventable tragedy.**

28.	In 1995, Austin police officer Drew Alan Bolin was tragically struck and killed by a driver in Central Austin. The errant vehicle maneuvered around the officer's patrol vehicle which had been stationed to channel traffic and then drove over a line of emergency flares set up to keep drivers out of the area surrounding a previous car accident before striking and killing Officer Bolin. The driver was intoxicated and convicted of negligent homicide.

29.	In 2003, an addled elderly man drove through a street closure sign and plowed into the farmer's market in Santa Monica, killing or injuring 73 individuals.

---

[4] City of Austin, *2014 SXSW Post-Event Evaluation*, attached as **exhibit 4.**
[5] Screen shot of "See Showcasing Bands in Your Hotel", available at http://sxsw.com/music/news/2014/2nd-play-stages-see-showcasing-bands-your-hotel, attached as **exhibit 3.**

6

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

30.     In 2006, at the 55th annual Madison Regatta in Indiana, a teenager drove through an unfortified road barricade with his vehicle and into a crowd of thousands of race-watchers. Ten people were seriously injured.

31.     In May 2011, a drunk driver left her lane and her errant vehicle struck and killed a young woman who was legally walking along the shoulder of a Central Austin street without sidewalks.

32.     In September 2011, a drunk driver in South Austin took a wrong turn onto Highway 71 and drove east for two miles in a westbound lane. The errant vehicle eventually struck a pizza delivery van causing the van to catch fire and killing the passenger of the errant vehicle.

33.     In May 2012, a driver falling asleep at the wheel failed to navigate the slight curve on Cesar Chavez along the Austin Hike and Bike trail in downtown Austin and careened over the curb into two people out for a morning walk along the lake. One pedestrian was killed by the errant vehicle and the other was severely injured.

34.     In July 2012, a drunk driver in downtown Austin mistakenly thought she was accessing the entrance ramp of I-35 but actually drove off a boat ramp and into Lady Bird Lake. A passenger in the backseat of the errant vehicle was trapped and drowned.

35.     In October 2012, in downtown Austin, a woman rapidly accelerated her car into a crowd of pedestrians in a cordoned-off area of Sixth Street and injured at least two people. Although not during the SXSW festival, this event occurred within the SXSW festival zone and was well known to SXSW festival planners and organizers.

36.     In August 2013, a man drove into the Venice Beach, California Boardwalk running down pedestrians, killing one and injuring 16.

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

37.     In March 2013, in downtown Austin, during the South by Southwest 2013 Music Festival, a man was struck by an errant vehicle at the intersection of Congress Avenue and Sixth Street. The driver fled the scene. The victim sustained severe, permanent injuries. This hit-and-run incident occurred exactly one year before the 2014 tragedy involved in this case, and SXSW representatives in the City of Austin SXSW Command Center learned of the incident almost immediately.

38.     In August 2014, a driver collided with shoppers and vendors at a street market in New Jersey, killing one person.

39.     On November 2, 2014, a pick up truck was unable to negotiate a curve on a Seattle street and plowed into the store front window of a Starbucks.

40.     The SXSW Defendants and the City of Austin knew about each of the above-listed errant vehicle incidents. The seven errant vehicle incidents listed above that occurred in Austin were highly publicized by Austin media outlets.

41.     Over the past six years, during the South by Southwest festival, in downtown Austin alone, there have been at least 80 documented instances of motorists colliding with pedestrians and another 73 documented instances of motorists colliding with bicyclists. That is 153 total prior instances of errant vehicles in Austin hitting pedestrians or bicyclists during the SXSW festival over six years. The SXSW Defendants and the City of Austin knew about these statistics.[6]

42.     Every year thousands of drivers make a wrong turn or lose control, propelling their vehicles into places they are not supposed to go. There are approximately 20,000 errant

_____

[6] Austin Police Department arrest data and collision statistics for George Sector during SXSW festivals 2009-2014, attached as **exhibit 5**.

8

vehicle collisions annually in the United States. The problem is pervasive and well known to traffic control engineers and traffic plan design consultants. Errant vehicle collisions with pedestrians and cyclists pose a risk of serious injury or death. This truth is borne out every time an errant vehicle collides with a pedestrian or cyclist. The safety of the public is a principal reason that the U.S. Department of Transportation and the State of Texas have promulgated guidelines for utilizing proper traffic control measures where temporary street closures are planned to host special events such as the SXSW music festival and why the City of Austin has mandated that traffic control measures conform to these standards.

43. During the planning leading up to the 2014 festival, the exact tragedy that occurred on March 13, 2014 was foreseen and discussed by festival organizers.

**1. Traffic control regulations establish standards for protecting pedestrians and cyclists from traffic around special events.**

*a. Federal Manual on Uniform Traffic Control Devices*

44. The Manual on Uniform Traffic Control Devices (MUTCD) is produced under the authority of the U.S. Department of Transportation, Federal Highway Administration and sets forth the basic principles and standards for the design and use of traffic control devices for all streets and highways open to public travel, regardless of type or class or the pubic agency having jurisdiction. Chapter 6F of the MUTCD provides specific guidelines and minimum standards for separating pedestrian and bicycle traffic from motor vehicle traffic during special events.[7]

45. Section 6F.85 of the Manual on Uniform Traffic Control Devices describes the use of temporary traffic barriers:

---

[7] MUTCD, chapter 6F, sections 85 and 86, attached as **exhibit 6**.

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

Temporary traffic barriers are devices designed to help prevent penetration by vehicles while minimizing injuries to vehicle occupants, and designed to protect workers, bicyclists and pedestrians. . . . .They are also used for certain special events or in other temporary traffic control contexts where separation and channelization of vehicle and pedestrian movement are needed.

The MUTCD defines crash cushions in section 6F.86:

Crash cushions are systems that mitigate the effects of errant vehicles that strike obstacles, either by smoothly decelerating the vehicle to a stop when hit head on, or by redirecting the errant vehicle. The two types of crash cushions that are used in temporary traffic control zones are stationary crash cushions and truck mounted attenuators.

One example of such a "stationary crash cushion" is a plastic, water-filled barrier also known as a jersey barrier or a K-rail. Plastic, water-filled barriers are specifically designed for temporary use around construction zones or large public events. When empty, these barriers are easily set up and taken down; however when filled with water, they are half as heavy as the cement variety. These barriers can also be filled with sand, gravel, and other ballast materials. A single person can easily and quickly move a water-filled barrier using a hand-operated pallet jack.[8] A hand-operated pallet jack operator can be assigned at a *de minimus* cost at key intersections or access points where the need for emergency vehicle access is anticipated because of the proximity to a hospital or fire house or emergency medical station, or to maintain access for other authorized vehicles such as those of residents. Moreover, the barriers can be sufficiently drained and moved by one person without the aid of a pallet jack in less than one minute in the event of an emergency. These barriers are readily available for rent or sale from traffic control device companies and are a ubiquitous sight around downtown Austin's Central Business District. Thus, these water-filled barriers are an optimal solution to be used anywhere pedestrians and bicyclists

_____

[8] Advertisements for rigid barrier with "Pallet Jack slots at bottom [that] allow for easy movement and transport" and advertisement for hand-operated pallet jack, attached as **exhibit 7**.

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

should be separated from moving vehicles. SXSW could have easily employed such traffic control devices for the protection of pedestrians and bicyclists, but inexplicably did not do so.

### b. *Texas Manual on Uniform Traffic Control Devices*

46. The State of Texas has adopted the Federal Manual on Uniform Traffic Control Devices. It is incorporated by reference in the TEXAS ADMINISTRATIVE CODE, Title 43, Section 25.1 and is recognized as the Texas standard for all traffic control devices installed on any street, highway, bikeway or private road open to public travel in Texas. It is adopted in accordance with 23 U.S.C. §§ 109(d) and 402(a).[9] The Manual is issued under the authority of the TEXAS TRANSPORTATION CODE, Chapter 544. Pursuant to the City of Austin's Standards Specifications Manual, Item 803S, it is a Right-of-Way permit holder's responsibility to ensure that all temporary traffic control barricades must, at a minimum, comply with the Texas MUTCD.

### c. *City of Austin Transportation Criteria Manual*

47. Section 8 of the City of Austin Transportation Criteria Manual (CATCM) addresses the "standardization of traffic control and traffic control devices."[10] Specifically, Section 8.5.1 speaks to the use of temporary traffic control devices. It is meant to be "a guiding philosophy of good temporary traffic control for the practitioner."[11] The Manual directs the user to refer to the Texas Manual on Uniform Traffic Control Devices when looking for "specific standards and warrants." Section 8.5.1(B) provides that traffic control devices are used as a means to provide traffic safety in temporary traffic control areas.

---

[9] Texas MUTCD, attached as **exhibit 8**.
[10] Section 8.1.0 of the City of Austin Transportation Criteria Manual, attached as **exhibit 9**.
[11] Section 8.5.1 of the City of Austin Transportation Criteria Manual, attached as **exhibit 9**.

11

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

48.     The City of Austin Transportation Criteria Manual describes the term traffic control as a means of "Incident Management". The definition of "Incident" in Section 8.5.2 includes a "special event."[12] A special event can be things "such as parades, sporting events and non construction street closures for filming and street events."[13] Temporary control devices, such as barricades, when used during such special events, "shall be set up and removed . . . in accordance with the current edition of the Texas Manual on Uniform Traffic Control Devices and this section."[14] Pedestrian safety is cited as an important consideration in planning any special event.

49.     Section 8.5.1(B) states that "[t]raffic safety in temporary traffic control areas should be an integral and high-priority element of every project from planning through design and construction" and that special events should be planned and implemented with pedestrian safety in mind at all times. Section 8.5.1(B) goes on to state that each special event is different and that a traffic control plan, in detail appropriate to the complexity of the event, should be prepared and understood by all responsible parties before the site is occupied.

50.     Section 8.5.3(G) of the CATCM makes clear that pedestrian safety in the special event zone is the responsibility of the permit-holder and it is their job to ensure that necessary safety concerns are addressed, and that there is a competent and trained person on-site to ensure compliance with applicable safety and traffic related rules, regulations, and standards.

51.     Section 8.5.1(E) of the CATCM also requires that the permit-holder routinely inspect all temporary traffic control devices to ensure that they "conform to the traffic control plan, and are effective in providing safe conditions for motorists, pedestrians, and workers."

[12] Section 8 of the City of Austin Transportation Criteria Manual, attached as **exhibit 9**.
[13] Section 8.5.2(B)(2 of the City of Austin Transportation Criteria Manual, attached as **exhibit 9**.
[14] Section 8.5.2(B)(2)(d) of the City of Austin Transportation Criteria Manual, attached as **exhibit 9**.

12

*William Josma v. SXSW*, Plaintiff's First Amended Petition

Moreover, Section 8.5.5(A) of the CATCM states that "[e]very effort should be made to separate pedestrian movement from…adjacent traffic."

### d. The 804 Series Standard Details

52. An industry standard that is adopted by various states and municipalities including the City of Austin is called the 804 Series Standard Details. The 804 Series as adopted by the City of Austin provides additional guidance to event planners and traffic control consultants for planning traffic control around events where planners anticipate large numbers of pedestrians and bicyclists.[15]

53. Standard No. 804S-5 of the 804 Series Standard Detail specifically states that "Barricades are located adjacent to traffic and are therefore subject to impact with errant vehicles…[thus] all barricade systems should be crashworthy." This Standard goes on to state that, under certain circumstances, "additional…barricading…may be required depending on the field conditions" and it is the permit holder's job to ensure that a competent person for traffic control is designated and that person "shall make inspections of the traffic control device at least two (2) times a day…ensuring that all devices are in their proper place and are in working order"—*i.e.* they are capable of effectively separating pedestrians from motor vehicles—including errant vehicles.[16]

54. The abundance of traffic control standards, manuals and guidelines that establish best practices makes SXSW's failure to deploy adequate traffic control measures inexcusable when it expected thousands of pedestrians and bicyclists to attend its festival.

---

[15] 804 Series Standard Details, section S-5 and S-6, attached as **exhibit 10**.
[16] Standard No. 804S-5 at pp. 4 and 12, attached as **exhibit 10**.

*William Josma v. SXSW*, Plaintiff's First Amended Petition

**2. The 2004 National Transportation Safety Board Investigation of the Santa Monica Farmer's Market Crash**

55.     One of the most high profile errant vehicle tragedies occurred in 2003 when an addled elderly man drove through a street closure sign and plowed into the farmer's market in Santa Monica, killing or injuring 73 individuals. The National Transportation Safety Board (NTSB) conducted an in-depth investigation regarding this errant vehicle crash and published a 50-page report in 2004 detailing its findings and recommendations.[17]

56.     Anyone involved with planning street closures to host pedestrian-oriented events such as the SXSW festival is, or certainly should be, familiar with the Santa Monica Farmer's Market errant vehicle crash and the published report of the NTSB investigation.

57.     The NTSB's strongest recommendation was that the traffic control planners responsible for the farmer's market should have deployed rigid barricades capable of absorbing and deflecting oncoming vehicles to prevent penetration by the moving vehicle into the pedestrian zone. Had such rigid barricades been properly deployed and in use, the driver of the errant vehicle would not have been able to penetrate the pedestrian zone and the injuries and fatalities would not have occurred.

58.     On July 16, 2003, in the middle of the afternoon, a Buick sedan driven by an 86-year-old male struck the rear corner of another vehicle that was stopped for pedestrians in a crosswalk at the intersection. The Buick continued through the intersection and past a "road closed ahead" sign. The errant vehicle proceeded through the farmer's market striking

---

[17] National Transportation Safety Board, *NTSB Highway Accident Report: Rear-End Collision and Subsequent Vehicle Intrusion Into Pedestrian Space at Certified Farmer's Market Santa Monica, California* (July 16, 2003), attached as **exhibit 11**.

14

*William Josma v. SXSW*, Plaintiff's First Amended Petition

pedestrians and vendor displays for two and a half blocks from where it entered the pedestrian zone before coming to rest.

59. The NTSB reported that witnesses stated that the driver accelerated after initially striking the vehicle stopped at the crosswalk. The report cites one witness who stated he observed no brake lights on the Buick. A second witness told investigators that he saw the driver of the errant vehicle with both hands on the steering wheel at the 10 and 2-o'clock positions, looking straight ahead. Still other witnesses described to police investigators the errant vehicle's movements through the farmer's market area as alternating between accelerating and decelerating, sometimes at high engine RPMs, as if the driver were pressing the accelerator pedal firmly. The driver of the errant vehicle stated to police investigators that he felt the vehicle accelerate three or four times as he proceeded through the farmer's market. Another witness stated that it appeared that every time the Buick struck an object in its path, the vehicle accelerated in response. A post-accident inspection and test of the Buick found no defect, deficiency, or abnormality in the vehicle's throttle controls, nor were any leaks, restrictions, or operational defects found in the brake assembly. The roadway where the market was held was a straight, level, asphalt, undivided street; it had one travel lane each westbound and eastbound. The farmer's market had been a regular event at this location in Santa Monica for 22 years.

60. As a result of this errant vehicle collision, ten pedestrians sustained multiple blunt force or traumatic injuries that proved fatal and an additional 63 people were injured, 18 seriously. This tragedy was widely reported through national media outlets and has been a prominent case study for traffic control engineers and traffic planning design consultants since 2004.

61.     The core facts of the Santa Monica crash are strikingly similar to what occurred on Red River Street in Austin at the 2014 SXSW festival: both errant vehicles intruded into a street marked by a road-closed sign; both errant vehicles continued for two blocks; witnesses of both incidents stated that they saw the vehicles accelerate and did not see brake lights; and both errant vehicles caused multiple deaths and injured dozens.

62.     Possibly the NTSB's most prophetic conclusion about the Santa Monica errant vehicle incident was that encouraging patrons of the farmer's market and other pedestrians to occupy the roadway when it was closed should have led planners and organizers to deploy rigid barriers to protect those pedestrians from vehicular traffic.[18] This conclusion alone should have put SXSW and its planners and organizers on notice of the risk an errant vehicle posed to SXSW festivalgoers, and made the 2014 SXSW crash a preventable tragedy.

63.     Following the crash, vendors in the Santa Monica farmer's market, recognizing the need for more substantial protection from errant vehicles, moved their personal vehicles to block access to the roadway, but the NTSB report noted that vehicles are not generally an appropriate countermeasure for this purpose because vehicles are not specifically designed to absorb a collision or to redirect an errant vehicle. In addition, vehicles are not safe traffic control measures because they contain flammable liquids and components, and other more appropriate options are available to protect pedestrians from errant vehicles.[19]

64.     The NTSB report concluded that a rigid barrier system would very likely have prevented the errant vehicle from intruding into the pedestrian area. This conclusion should not have been lost on SXSW and its planners and organizers.

_____

[18] *NTSB Highway Accident Report*, at p. 44, attached as **exhibit 11**.
[19] *NTSB Highway Accident Report*, at p. 44, attached as **exhibit 11**.

16

65.     The NTSB Report, issued in 2004—10 years before the SXSW crash—stated that the Board would inform the American Association of State Highway and Transportation Officials, the American Public Works Association, the United States Conference of Mayors, the National Association of Counties, and the National Association of Towns and Townships of the circumstances of the Santa Monica farmer's market errant vehicle collision and emphasize the importance of physical barriers in protecting the public at farmer's markets and similar events. The Report was widely distributed and readily available to traffic design consultants and planners and even the public at large. It was surely as readily accessible to SXSW, a sophisticated e-commerce vendor.

66.     The notoriety of this event, the resources expended by the NTSB to investigate and analyze this event, the subsequent publication and distribution of the NTSB report, and the availability and use of the Report as a case study made the circumstances of the March 13, 2014 SXSW errant vehicle collision readily foreseeable. Moreover, had SXSW planners and organizers followed the recommendations of the NTSB that grew out of the Santa Monica errant vehicle collision by deploying adequate rigid barriers around the perimeter of the area under its control on Red River, the SXSW Defendants and the City of Austin could have prevented the tragedy that resulted in multiple injuries and deaths on March 13, 2014.

### 3. The May 2012 errant vehicle collision on the Austin Hike and Bike Trail in downtown Austin

67.     There was another, more recent errant vehicle collision that caused serious injury and death to pedestrians in the Central Business District of Austin, the very district SXSW designated for its festival. In the spring of 2012, a driver falling asleep at the wheel failed to

17

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

navigate a slight curve on Cesar Chavez along the Butler Hike and Bike Trail in Austin and careened over the curb into two people out for a morning walk along the lake.[20] One pedestrian was killed and the other was severely injured. Shortly thereafter the City of Austin deployed rigid barricades designed to deflect an errant vehicle and prevent a similar incident from recurring. This Austin Hike and Bike Trail collision—well publicized and a mere two years before the 2014 SXSW tragedy—made the danger of errant vehicle incidents that much more foreseeable to SXSW planners and organizers.

68.      This event would have led an ordinarily prudent person planning a music festival in Austin like SXSW to anticipate the risk posed by an errant vehicle collision. This is all the more so where SXSW expected well over 40,000 people to attend the festival and where SXSW assumed control of various streets that SXSW intended to close to vehicle traffic because of the pedestrian and bicycle traffic expected from invited festival attendees.

### 4.   The July 2012 errant vehicle into Lady Bird Lake in downtown Austin

69.      In yet another, recent errant vehicle collision that caused serious injury and death in downtown Austin, the area where SXSW holds its festival, a young woman who had been drinking at a bar on Rainey Street, mistakenly thought she was accessing the on ramp to I-35 but actually drove into Lady Bird Lake. Austin police officers were able to rescue the driver of the errant vehicle and her front passenger but the back seat passenger was trapped and tragically

---

[20] *Austin officials seek permanent trail safety barriers on Cesar Chavez*, AUSTIN AMERICAN-STATESMAN (July 13, 2014), attached as **exhibit 12**.

18

drowned. The driver was charged with intoxication manslaughter and aggravated assault with a deadly weapon (*ie* her vehicle).[21]

70.     This tragedy—well publicized in local media and less than two years before the 2014 SXSW tragedy—made the danger of errant vehicle incidents that much more foreseeable to SXSW planners and organizers.

### 5.   The October 2012 errant vehicle incident on Sixth Street in downtown Austin

71.     In yet another, even more recent errant vehicle collision that caused injury in downtown Austin, a waitress legally parked her car along Sixth Street in the afternoon before her shift at a Sixth Street bar. While she was working, the Austin Police Department closed Sixth Street to vehicular traffic as it does every weekend night. The woman's shift ended as the bars were closing so Sixth Street was crowded with pedestrians exiting the closing bars. The woman tried to drive her now-errant vehicle through the crowd and up to 15 presumably drunk pedestrians attached her vehicle. In a panicked effort to escape, the woman accelerated causing her tires to squeal loudly. A nearby Austin Police Officer heard the tires squeal and turned to see the errant vehicle driving through the crowd. The officer fired shots at the vehicle. He missed and the panicked woman continued to try to drive out of the area. Some of the crowd was mildly injured by the errant vehicle.[22]

72.     This incident—well publicized in local media and less than 18 months before the 2014 SXSW tragedy—made the danger of errant vehicle incidents that much more foreseeable to SXSW planners and organizers.

---

[21] Julie Change, *Lustre Pearl to pay $40,000 fine after patron's death*, AUSTIN AMERICAN-STATESMAN (Oct. 9, 2013), attached as **exhibit 13**.

[22] Wells Dunbar, *No Charges for Driver Shot at by Police While Fleeing Sixth Street*, KUT (Oct. 23, 2012), attached as **exhibit 14**.

19

### 6. The March 2013 errant vehicle hit-and-run during the SXSW festival in downtown Austin

73.     On March 15, 2013, during South by Southwest 2013 Music Festival, a man was struck and severely injured by an errant vehicle that had illegally entered a crosswalk. This incident occurred at the intersection of Congress Avenue and Sixth Street in downtown Austin. After striking the victim, the driver fled the scene in his vehicle. He then abandoned the vehicle and ran on foot. According to eyewitnesses, the driver stumbled as he exited the truck and had bloodshot eyes. This hit-and-run incident occurred only one year before the tragedy at issue in this lawsuit.[23] The SXSW Defendants knew of this incident immediately after it happened in 2013 because SXSW's representatives filled posts within the City of Austin's SXSW Command Center. Upon information and belief, this incident was reported to the Command Center almost immediately, giving SXSW's representatives and the City of Austin actual knowledge of this collision

74.     This hit-and-run incident involving an errant vehicle—well-publicized in local media and exactly one year before the 2014 SXSW tragedy—made the danger of errant vehicle incidents that much more foreseeable to SXSW planners and organizers. This incident alone should have been enough to put the SXSW Defendants and the City of Austin on notice that it was foreseeable that an errant vehicle could strike festival attendees.

### 7. The City of Austin's *2012 Traffic Fatality Report*

75.     In 2012, Austin ranked seventh among the United States' largest cities (*ie* with populations over 500,000) in the number of pedestrians that were killed. There are over 70 cities

---

[23] David Barer, *Seven-figure lawsuit filed in 2013 SXSW hit-and-run*, KXAN (March 18, 2015), attached as **exhibit 15**.

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

in the United States with populations over 500,000. Therefore Austin has the unfortunate distinction of being among the top 10% most unsafe cities for pedestrians and bicyclists in the United States.

76.     In 2012, Austin had a fatality rate of 2.97 pedestrians killed per 100,000 residents. These and other disturbing facts about Austin's dangerous problem with pedestrian and bicycle safety were published in an April 15, 2013 report—nearly one year before the SXSW crash at issue in this case— by the City of Austin entitled "City of Austin 2012 Traffic Fatality Report."[24] The report also contained the following facts:

- Increased risk of injury or death for pedestrians is a frightening national trend - across the U.S., pedestrians accounted for 14 percent of all traffic fatalities in 2012, up from 11 percent in 2007 - and is especially severe in Austin where pedestrians make up around a third of all traffic fatalities.

- Alcohol and other drugs contributed to 51% of all traffic fatalities in Austin during 2012; speeding contributed to 32%; not wearing a seatbelt 18%; and, pedestrians attempting to cross freeway mainlanes represented 23% of all pedestrian fatalities.

- Austin experienced 78 traffic fatalities in 2012 - a 42% increase from 2011.

77.     The City's report—published 11 months before the tragedy at issue in this case— included detailed crash maps for pedestrians, motorcyclists and bicyclists. The map entitled "Pedestrian Crashes in 2012" shows an obvious concentration of pedestrian-vehicle incidents in downtown Austin.[25] The map entitled "Bicycle Crashes in 2012" likewise shows an obvious

---

[24] City of Austin, *2012 Traffic Fatality Report*, attached as **exhibit 16**.
[25] City of Austin, *2012 Traffic Fatality Report*, at p. 57, attached as **exhibit 16**.

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

concentration of bicycle-vehicle incidents in downtown Austin.[26] This is the same are—and undisputedly *in the vicinity*—where the SXSW festival takes place each year.

78.     The City's Report also includes a summary regarding the City of Austin's 2012 Transportation Safety Summit. The Transportation Safety Summit was attended by "stakeholders from across the 4 E's of safety - Environment, Education, Enforcement, and Evaluation. It was the largest meeting to date in Central Texas focused on improving transportation safety." Upon information and belief, SXSW's planner and organizers including Defendant Lowe and Defendant Transportation Design Consultants knew about and/or attended the summit. SXSW's planner and organizers including Defendant Lowe and Defendant Transportation Design Consultants are the types of stakeholders that the Transportation Safety Summit was intended to educate.

79.     The *City of Austin 2012 Traffic Fatality Report* was distributed to stakeholders including, upon information and belief, SXSW's planner and organizers including Defendant Lowe and Defendant Transportation Design Consultants. The disturbing facts in the City of Austin's report regarding Austin's dangerous problem with pedestrian and bicycle safety put the SXSW Defendants on notice that it was foreseeable that an errant vehicle could strike festival attendees a mere 11 months later. The SXSW Defendants' email exchanges about safeguarding pedestrians from motor vehicle traffic in the area reflect their knowledge of the problem of such incidents in Austin.

---

[26] City of Austin, *2012 Traffic Fatality Report*, at p. 59, attached as **exhibit 16**.

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

**8. The SXSW Defendants' February and March 2014 emails regarding rigid, water-filled barriers**

80.    In February 2014, during planning of the 2014 South by Southwest Festival, the SXSW Defendants exchanged emails that discussed the use of water-filled barriers at the upcoming festival.[27] The purpose of those water-filled barriers was to keep pedestrians and bicyclists safe from the nearby traffic.

81.    A February 28, 2014 email exchange recognizes the need to "keep the humans safe!!!".[28] SXSW's response to a suggestion to use more water-filled barriers was to ask "who's paying for it?".  SXSW ultimately rejected the suggestion to use those same barriers throughout the festival despite their recognized need to "keep the humans safe".[29]

82.    In fact, the day before the "keep humans safe" email exchange took place, Defendant Lowe asked a supplier about the potential cost for 450 feet—more than the length of a football fields' worth— of the rigid, water-filled barriers.[30] Despite recognizing the need for an additional 150 yards, there's no evidence that 450 feet of additional barriers were ever deployed. While the SXSW Defendants were apparently willing to pay $6500 and trade "2 plat [platinum] badges and 20 music bands" for the water-filled barriers used at the Empire Garage Venue,[31] the SXSW Defendants were unwilling to bear the *de minimus* cost of renting an additional 450 feet of water-filled barriers to protect the festival attendees on Red River Street. Less than three weeks after these emails were sent, the SXSW crash occurred.

---

[27] Emails including email from Defendant Lowe to SXSW Community Liaison Christian Mella and Nick Brown (Feb. 12, 2014), attached as **exhibit 17**.
[28] Emails including email from Brad Spies (Feb. 28, 2014) at p.2, attached as **exhibit 18**.
[29] Emails including email from SXSW Community Liaison Christian Mella (March 2, 2014) at p. 2, attached as **exhibit 18**.
[30] Emails including email Defendant Lowe to Victor Pena (February 27, 2014), attached as **exhibit 19**.
[31] Email from Defendant Lowe to Brad Spies (March 1, 2014), attached as **exhibit 20**.

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

### 9. The March 2014 tabletop exercise wherein first responders and SXSW planners trained for a potential errant vehicle incident

83. In early March 2014, a mere week before the tragedy at issue in this case, Austin first responders and festival planners held a tabletop training exercise to review "how they would handle an incident in which a car plowed into attendees."[32] Upon information and belief, SXSW planners and organizers were aware of the tabletop exercise. Upon information and belief, SXSW planners and organizers attended the tabletop exercise and were informed of the subjects discussed at tabletop exercise meeting after it took place but before the tragedy at issue in this case. This demonstrates that the crash that is the subject of this lawsuit was not only foreseeable, it was in fact anticipated.

### 10. Rigid, water-filled barriers are a ubiquitous sight throughout Austin's Central Business District.

84. For several years leading up to the 2014 SXSW festival and continuing throughout 2014, Austin has been undergoing a construction boom. Construction sites throughout the Central Business District have deployed rigid barriers that are often water-filled or otherwise fortified. The use of such rigid barriers throughout Austin's Central Business District is a ubiquitous sight that highlights the need for these types of traffic control measures during a street festival that is surrounded and crisscrossed by active motor vehicle traffic.[33] The sight of such barriers, including use of rigid barriers to close vehicular access to streets and driveways, is so common that one cannot travel through Austin's Central Business District without seeing multiple locations utilizing these types of barriers. For instance, as of November

---

[32] Eric Dexheimer, *SXSW crash: One Tragic Night. One Year Later: 'I saw a lot of bystanders just running and screaming and crying'*, AUSTIN AMERICAN-STATESMAN (March 13, 2015), attached as **exhibit 21**.
[33] Photographs of rigid barriers throughout the Central Business District, attached as **exhibit 22**.

24

*William Josma v. SXSW*, Plaintiff's First Amended Petition

2014, there were rigid barriers at the following locations in the Central Business District to separate pedestrians from motor vehicles:[34]

- 2nd Street and Congress Avenue,

- 5th Street and Trinity Street,

- 9th Street and Neches Street,

- 15th Street and Trinity Street,

- Cesar Chavez Street and San Antonio Street (closing a street to vehicles),

- Cesar Chavez Street and Lamar Avenue,

- Guadalupe Street and Martin Luther King Boulevard (closing a driveway to vehicles),

- South First Street and Riverside Drive (near Auditorium Shores entrance),

- 4th Street and Colorado Street,

- 5th Street and Colorado Street, and

- 7th Street and Colorado Street.

In fact, on March 13, 2014, rigid water-filled barriers were in use by SXSW at 7th Street and Red River Street to channel SXSW traffic.[35]

C. **Excessive alcohol consumption and drunk driving in and around the SXSW festival zone should be well known to SXSW.**

1. **Austin is number one for alcohol consumption in Texas.**

85.   The zip code for Austin's Central Business District, 78701, leads the state for alcohol consumption.[36] According to Austin Police Chief Art Acevedo, the drunken driving-

---

[34] Photographs of rigid barriers throughout the Central Business District, attached as **exhibit 22**.
[35] Traffic Control Plan, attached as **exhibit 23**.

25

related death rate in Texas is among the highest in the United States.[37] Over the course of the past decade, Travis County has had the highest per capita alcohol consumption rate of any county in Texas by far – estimating an average of $410.05 in alcohol sales per capita per year during that time period.[38] SXSW places its festival in Austin's Central Business District.[39] Whether Texas leads the nation in DWI related fatalities or Austin's 78701 zip code is among the highest in Texas for alcohol consumption, there is no question that the SXSW Defendants and the City of Austin should have known that excessive alcohol use and driving while intoxicated during the SXSW festival threatened public safety.

## 2. Excessive DWI and PI arrests each year at SXSW demonstrate why SXSW and the City of Austin should have anticipated the risk of intoxicated drivers and errant vehicles.

86.    Over the five years preceding the 2014 SXSW festival—from 2009 to 2013—there were 527 arrests for public intoxication or driving while intoxicated during the SXSW festival in the specific area of downtown Austin where the festival is held. The Austin Police Department refers to this area of downtown as the "George Sector" and it encompasses Austin's Central Business District where the SXSW festival takes place.[40] George Sector is bordered on the east by Chicon Street, on the west by Lamar Boulevard, on the north by 11th Street, or 12th Street where 12th Street exists, and on the south by Lady Bird Lake. This discrete area of Austin,

---

[36] Gary Dinges, *Does Austin have a drinking problem?*, AUSTIN AMERICAN-STATESMAN (March 15, 2014), attached as **exhibit 24**; *Americas Drunkest Cities of 2011*, THE DAILY BEAST (Dec. 28, 2011), attached as **exhibit 25**; Andrew Weber, *The Top 10 Austin Top 10 Lists*, KUT (April 22, 2013), attached as **exhibit 26**.
[37] W. Gardner Selby, *Austin police chief says Texas leads nation in drunk driving deaths*, KVUE (Nov. 18, 2010), attached as **exhibit 27**.
[38] *Id.*
[39] Right-of-Way Permit Application designating Central Business District as location of SXSW Music Festival, attached as **exhibit 28**.
[40] Map of the "George Sector", attached as **exhibit 29**; Austin Police Department arrest data and collision statistics for George Sector during SXSW festivals 2009-2014, attached as **exhibit 5**.

26

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

fully encompassing the Central Business District, is where the SXSW festival primarily takes place and where the errant vehicle collision of March 13, 2014 occurred.

87.     Of the 527 alcohol related arrests during the week of SXSW from 2009 to 2013, there were 171 arrests for driving while intoxicated and 356 arrests for public intoxication in the specific area of downtown Austin for which SXSW obtained permits to host its festival and where it implemented its Traffic Control Plan.[41] And as set forth previously in paragraph 30 and incorporated as it fully sets forth here, over this same period of time 153 motor vehicle and pedestrian or bicycle collisions occurred during the SXSW festivals, and SXSW festival organizers knew of this risk years prior to the 2014 SXSW crash.

88.     During the week of SXSW within the George Sector the numbers break down as follows: In 2009, there were 39 arrests for driving while intoxicated (DWI) and 18 for public intoxication (PI); in 2010 there were 32 DWIs and 78 PIs; in 2011 there were 17 DWIs and 102 PIs; in 2012 there were 37 DWIs and 70 PIs; and in 2013 there were 46 DWIs and 88 PIs.[42] These facts are public information and are readily available to anyone, including SXSW and its planners and organizers, from the Austin Police Department. These arrests demonstrate that every year during SXSW for at least the last 5 years, intoxicated drivers were driving in the very area where the 2014 incident occurred, making a collision involving such a driver a genuine and readily foreseeable risk. Given that the majority of SXSW venues are bars with liquor licenses, the fact that substantial alcohol consumption would take place should have been obvious to the SXSW Defendants and the City of Austin. And given the intoxication related arrests for the

---

[41] Application for Right-of-Way Permit, attached as **exhibit 28**; SXSW's Traffic Control Plan, attached as **exhibit 23**.
[42] Austin Police Department arrest data and collision statistics for George Sector during SXSW festivals 2009-2014, attached as **exhibit 5**.

previous five years, it was not only a risk that there would be intoxicated drivers in and around the SXSW festival, it was a foregone conclusion of which SXSW was well aware.

89. During the 2014 SXSW festival, there were 328 intoxication related arrests citywide, and 63 of those arrests occurred in the Central Business District of Austin, the same area where the majority of the SXSW festival takes place.[43] Nearly 20% of the overall arrests for excessive alcohol consumption made citywide during the week of SXSW occurred within the SXSW festival zone itself. Breaking the number down further, there were 21 arrests of drunk drivers within the George Sector (the area of downtown Austin that encompasses the SXSW festival) during the 2014 weeklong festival. Twenty-one drunk drivers within such a limited area and in such a short time span is extraordinary. These arrest statistics provide further compelling reasons for why the SXSW Defendants and the City of Austin should have anticipated—and in fact expected—that an errant vehicle operated by an intoxicated person might penetrate an area where SXSW encouraged pedestrians and bicyclists to congregate.

90. Similarly, SXSW should have known of the highly publicized drunk driving situation that exists in Austin, particularly during the SXSW festival in the City's Central Business District where most of the official SXSW bar venues are located. Because of the magnitude of alcohol consumption in and around the festival, SXSW was on notice of an even higher degree of risk to festivalgoers congregating in the street adjacent to SXSW venues. There is simply no legitimate reason for SXSW not to have recognized that in planning a festival held largely in bars scattered throughout the Central Business District attracting hundreds of thousands of patrons, many festival attendees would become intoxicated and that some would

---

[43] Austin Police Department arrest data and collision statistics for George Sector during SXSW festivals 2009-2014, attached as **exhibit 5**.

*William Josma v. SXSW,* Plaintiff's First Amended Petition

drive through the area to go home or drive to other festival related events, in violation of the law and substantially increasing the risk of an errant vehicle collision with festival-going pedestrians.

91.     SXSW also knew or should have known that drivers under the influence of alcohol pose a risk of harm to festivalgoers who are congregating in and around the festival venues as well as entering and exiting the festival venue zones because driving while intoxicated often results in crashes that cause serious injury and death.

### D. Other factors should have compelled SXSW to guard against errant vehicles.

#### 1. SXSW had superior knowledge of the risk posed by errant vehicle collisions.

92.     SXSW's 27 years of experience planning and organizing this music festival in an urban Austin setting gave SXSW and its planners and organizers superior knowledge of the risk that an errant vehicle could penetrate those streets it closed to traffic for SXSW events. Similarly, this experience gave SXSW superior knowledge that festival attendees congregating in the sections of the streets SXSW chose to close to traffic could sustain serious bodily injury or death if an errant vehicle intruded into the area. SXSW retained a traffic planning consultant to design a traffic control plan to address this risk. Patrick Lowe and the consulting firm that he owns and operates, Transportation Design Consultants, were traffic control consultants engaged by SXSW to obtain the Right-of-Way permits SXSW used to occupy and control the premises in the Central Business District where it held the music festival and to develop and prepare a traffic control plan in accordance with city ordinances. Patrick Lowe and Transportation Design Consultants were SXSW's agents in planning and organizing the street closures for the music

29

festival.[44] SXSW had control over how Patrick Lowe and Transportation Design Consultants performed their job because he and his company were SXSW Defendant's agents.

93.    The science of traffic control is the science of managing traffic around people. This includes safety planning for special events such as a music festival held in the streets while live lanes of traffic surround and crisscross the festival area. SXSW had 27 years of experience operating this festival; prior errant vehicle collisions throughout the United States and in Austin were widely reported; extensive materials were available that provided guidelines and ordinances in place that established standards for preventing errant vehicle collisions with pedestrians at special events; and SXSW engaged a traffic control consultant whose principal responsibility is to safely manage traffic around events with large crowds of pedestrians and bicyclists. Considered together, these factors gave the SXSW Defendants and the City of Austin superior knowledge of the risk that errant vehicles posed to festival attendees. The SXSW Defendants' and the City of Austin's superior knowledge of the risk made the 2014 SXSW crash foreseeable, and therefore a preventable tragedy.

94.    If the SXSW Defendants and the City of Austin determined that they could not ensure the safety of the hundreds of thousands of pedestrians and bicyclists who it invited and encouraged to congregate in the Central Business District to attend festival events, it should not have negligently closed streets utilizing inadequate traffic control measures; rather, it should have held the festival in a safe alternate location or implemented adequate traffic control measures utilizing rigid barricades designed to protect festivalgoers on foot and on bicycle from errant vehicles.

---

[44] Right-of-Way Permit Application, attached as **exhibit 28**.

30

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

**2. It would not have been onerous for SXSW to secure festival areas from errant vehicular traffic.**

95.     It would not have been onerous for SXSW to create secure areas free from vehicular traffic. In fact, SXSW utilized the very types of rigid barricades that would have prevented this tragedy on nearby streets to channel traffic into a designated parking garage.[45] The Traffic Control Plan designated these types of barriers to create a traffic queue into the Empire Garage on East 7th Street, two blocks away from the section of Red River Street where the SXSW tragedy occurred. Had SXSW utilized these same barriers to close access to Red River Street at 9th Street and at 10th Street, the collision that claimed the lives of four people and injured William would not have occurred. SXSW could have easily used safe and effective rigid barricades that were sufficient in number for *de minimus* cost to ensure that its festival attendees on Red River Street were protected from errant vehicular traffic.

96.     SXSW knew that its festival brought over 375,000 people into the center of Austin. SXSW encouraged festivalgoers to walk or use bicycles to navigate the downtown area while traveling from one venue to another or to and from their hotels. Given the tens of millions of dollars in revenue generated each year for the for-profit companies that own and operate the SXSW festival, it would not have been burdensome for SXSW to establish dedicated lanes for pedestrians and bicyclists throughout the Central Business District. These lanes, utilizing rigid barricades, would provide effective and positive separation of vehicles from pedestrians and bicyclists, keeping them safe from vehicular collisions, serious injury and death. A network of such lanes created by interlocking rigid barricades that can be filled with water would provide

---

[45] SXSW's Traffic Control Plan, attached as **exhibit 23**.

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

secure and reliable channels for the hundreds of thousands of festivalgoers to safely navigate the downtown area while motor vehicles crisscross the same areas.

### 3. SXSW's Right-of-Way permit gave SXSW legal possession and control of the street where the crash occurred.

97.    SXSW began the process of procuring Right-of-Way permits to host the 2014 festival by engaging an agent to submit its applications. SXSW retained Transportation Design Consultants and its principal Patrick Lowe as its agents to prepare and submit applications for Right-of-Way permits designating the specific streets and blocks SXSW wanted to possess and control in order to host its 2014 festival and set up venues.[46] Notwithstanding the size and magnitude of the festival, the Texas Board of Professional Engineers website shows no record that a Patrick Lowe is a licensed traffic engineer, or a licensed engineer of any kind for that matter, by the State of Texas.[47]

98.    To justify the Right-of-Way permit that Defendant Lowe and Defendant Transportation Design Consultants submitted for SXSW for the various street closures, Lowe under-estimated the number of SXSW festival attendees as 40,000. In actuality, SXSW anticipated selling, and in fact did sell, well over 40,00 credentials and knew that attendance would be far in excess of this number.[48] Moreover, the SXSW Defendants made the knowingly false statement on its Right-of-Way permit application that no alcoholic beverages would be *sold or consumed* within the closed off area.

99.    The Right-of-Way permit application submitted by Defendant Lowe on behalf of SXSW requested Right-of-Way permits for multiple streets including Red River Street between

---

[46] Application for Right-of-Way permit, attached as **exhibit 28**.
[47] Screenshot of the Texas Board of Professional Engineers website, attached as **exhibit 30**.
[48] Application for Right-of-Way permit, attached as **exhibit 28**.

*William Josma v. SXSW*, Plaintiff's First Amended Petition

8th Street and 11th Street. The City of Austin approved the application and issued the Right-of-Way permit for the requested street closures giving SXSW the right to occupy and control the premises including the 900 block and 1000 block of Red River Street.[49] Thus, SXSW anticipated that its invitees would utilize that section of Red River to attend the venues where the SXSW bands performed.

100. The Right-of-Way permit further required that the applicant submit a Traffic Control Plan that conformed to the Texas Manual on Uniform Traffic Control Devices as well as the City of Austin Transportation Criteria Manual or the 804 Series Standard Details.

101. In the early morning hours of March 13, 2014, SXSW was the possessor and in control of the premises between 9th Street and 11th Street on Red River pursuant to the Right-of-Way permit for this section of the Central Business District. SXSW created a festival zone in front of the four official SXSW venues in that section of Red River Street: the indoor and outdoor Cheer Up Charlie's venues and the indoor and outdoor Mohawk venues.

E. **The City of Austin's *2014 SXSW Post-Event Evaluation*.**

102. The City of Austin *2014 SXSW Post-Event Evaluation* includes examples of major safety and traffic control concerns that have been pervasive throughout the last several years at the SXSW festival. In fact, the City of Austin characterizes the traffic and safety situation as "critical."[50] The *2014 SXSW Post-Event Evaluation* goes on to state that "crowd management is worsening," and calls for major changes to address public safety concerns.

103. The *2014 SXSW Post-Event Evaluation* cites several concerns that were or should have been obvious to SXSW such as: overcrowding, inadequate staffing, alcohol consumption

---

[49] Right-of-Way permit, attached as **exhibit 31**.
[50] City of Austin, *2014 SXSW Post-Event Evaluation*, attached as **exhibit 4**.

33

*William Josma v. SXSW*, Plaintiff's First Amended Petition

(alcohol is sometimes provided to patrons for free), and negligent traffic control planning and implementation. With respect to this last point, the *2014 SXSW Post-Event Evaluation* specifically cites to several contributing factors including: late changes to SXSW's Traffic Control Plan, the failure to implement approved changes to the Traffic Control Plan, SXSW's failure to communicate changes to the Traffic Control Plan to its staff and barricade providers, and improper installation of barricades.[51] This report reveals a mere sample of the extent of SXSW's negligence, indeed incompetence, in planning, implementing and maintaining a traffic control plan sufficient to provide for the safety of festivalgoers given the scope and complexity of the SXSW festival. This report is further evidence that SXSW had knowledge of the risk of intoxicated drivers, inadequate traffic control crowd arrangement problems, excessive alcohol consumption and the risk that there elements would result in an errant vehicle crash with SXSW patrons.

## F. The events of the early morning hours of March 13, 2014

104. An already intoxicated Rashad Owens openly drank alcohol and smoked marijuana inside Club 1808, a bar located just east of downtown Austin at 1808 East 12th Street in Austin. Inside the bar, Mr. Owens's friend, Andrew Bramwell, gave Mr. Owens the keys to Mr. Bramwell's 2012 Honda Civic. Mr. Owens got in the Civic and drove west toward downtown Austin.

105. William was working as a SXSW volunteer and managing the crowds on Red River Street as Mr. Owens approached the corner of 9th Street and Red River. Mr. Owens turned to the right, heading north and easily penetrated the area where SXSW festivalgoers were

---

[51] City of Austin, *2014 SXSW Post-Event Evaluation*, at pp. 8-9, attached as **exhibit 4**.

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

congregating on Red River Street for the SXSW showcases being held there because there were no barricades in place to prevent him from doing so. The errant vehicle continued to advance north as it collided with multiple pedestrians including William. The vehicle breached the perimeter at the opposite end of the block of Red River at 10th Street and continued north into the 1000 block of Red River towards 11th Street.

106. The errant vehicle collision that injured William was a preventable tragedy that the SXSW Defendants and the City of Austin should have anticipated, and in fact did anticipate, and should have guarded against. Had they done so, William would not have been injured and traumatized.

## VII. CAUSES OF ACTION

### Count 1. Negligence by the SXSW Defendants

107. Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 1.

1. **Duty - The SXSW Defendants owed William a duty to exercise reasonable care to avoid a foreseeable risk.**

   *a. The risk was an errant vehicle.*

108. A special event such as the music festival planned and organized by SXSW, Patrick Lowe, and Transportation Design Consultants (hereinafter "SXSW Defendants") that was to take place in the middle of an urban central business district surrounded and crisscrossed by live traffic was vulnerable to the risk posed by an errant vehicle. The risk was that an errant vehicle would penetrate the perimeter of the festival zone that had been cordoned off for pedestrians and cyclists. Any collision between an errant vehicle and a pedestrian or bicyclist is likely to result in serious injury or death to the pedestrian or bicyclist.

   *b. The risk of an errant vehicle was foreseeable.*

109.    Foreseeability of a danger does not require that the exact sequence of events that produced the harm be predicted. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992); *Mellon Mortgage Co. v. Holder*, 5 S.W3d 654, 655 (Tex. 1999). It simply requires that the general danger be foreseeable. The general danger of an errant vehicle penetrating the perimeter of the festival zone and colliding with and injuring or killing festivalgoers was or should have been foreseeable to the SXSW Defendants. Defendants knew or should have known that the risk of an errant vehicle incident was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas—such as the 2003 Santa Monica Farmer's Market crash, the 2012 Austin Hike and Bike Trail, and the 2013 Venice Beach boardwalk crash—have resulted in serious injuries and deaths. These previous errant vehicle incidents made the incident of March 13, 2014 at the SXSW festival readily foreseeable.

110.    Moreover, SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles and SXSW purposefully designed the festival so that pedestrians and attendees on bicycles were forced to congregate in and travel through areas immediately bordered by live lanes of traffic. In fact, this was an aspect of the festival that SXSW boasted was unique.

111.    SXSW recognized the risk posed by traffic and took steps—albeit negligent and inadequate steps—to close streets to traffic in light of that risk using simple signage.

112.    Furthermore, public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival is a well documented fact through both the elevated number of arrests each year during the festival and because of the media's coverage of the issue.

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

Thus the general danger to a festivalgoer such as and including William from an errant vehicle driven by an intoxicated person was also foreseeable.

113. Similarly, the general danger of serious bodily injury or death from an errant vehicle to a festivalgoer such as and including William in and around the SXSW festival was foreseeable to the SXSW Defendants. Similarly, the general danger to William from an errant vehicle driven by an intoxicated person in and around the SXSW festival was foreseeable.

114. The general character of the injury could be reasonably anticipated by the SXSW Defendants in light of the serious injuries and deaths that resulted from similar prior incidents including the Santa Monica Farmer's Market crash, the Venice Beach Boardwalk crash, and the Austin Hike and Bike Trail collision. Each of these incidents caused serious bodily injuries and deaths from the impact of a moving motor vehicle colliding with pedestrians and cyclists. Because foreseeability of a danger does not require that the exact sequence of events that produced the harm be predicted, the widespread and recurring incidents of errant vehicle crashes nationally, the high profile nature of some of them such as the Santa Monica Farmer's Market crash that killed 10 and injured 63—18 seriously, and the serious injury and death that occurred as a result of an errant vehicle crash that occurred on the Austin Hike and Bike Trail a mere two years before the 2014 SXSW crash all make the danger of an errant vehicle intruding into closed streets hosting the SXSW festival a foreseeable and predictable event.

115. Finally, where the injured person is situated close to the wrongful act, his or her injury is all the more foreseeable. William was injured quite close to where the SXSW Defendants failed to deploy rigid barriers that would have prevented the errant vehicle from penetrating the perimeter of the festival zone at Red River Street and 9th Street.

   c. *The risk of an errant vehicle posed a likelihood of injury.*

116. The likelihood of serious injury or death resulting from a collision between a moving vehicle and a pedestrian or cyclist is self evident. In addition, the reality that serious injury and death will result from an errant vehicle incident is well documented and publicized. The 18 serious injuries and 10 deaths that occurred as a result of the 2003 Santa Monica Farmer's Market Crash and the serious injuries to one individual and the death of another individual as a result of the 2012 Austin Hike and Bike Trail errant vehicle collision underscore the likelihood that injuries and deaths, would occur as a result of the errant vehicle collision with pedestrians and cyclists on March 13, 2014 at the SXSW Festival on Red River Street between 9th and 11th streets.

### d. The SXSW Defendants possessed superior knowledge of the risk of an errant vehicle.

117. The SXSW Defendants had superior knowledge of the risk and general danger posed to festivalgoers such as and including William from errant vehicle collisions because they are festival promoters with 27 years' experience in holding a music festival in the urban, downtown Austin environment and they are traffic design consultants who's professional occupation is to plan and manage traffic around crowds in such an environment.

### e. The Risk-Utility Test factors weigh in favor of placing a duty to act with reasonable care on the SXSW Defendants.

118. Defendants are in the best position—or at the least were in a better position than the general public that was congregating on Red River Street including William—to ensure that proper traffic control measures were deployed to protect pedestrians and bicyclists who were SXSW festival attendees such as William because the duty is more easily and reasonably borne by the SXSW Defendants. The consequences of placing the duty to take steps to protect pedestrians and cyclists attending the SXSW festival would simply require Defendants to deploy

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

adequate traffic control measures and the practical reality and the financial cost of doing so is *de minimus* given the tens of millions of dollars in revenue that the festival generates each year for SXSW and its owners. Proper traffic control measures to separate moving vehicles from pedestrians, including rigid barriers are so widely available and used throughout Austin's Central Business District that they are a ubiquitous site at virtually every temporary street closure for construction in the Central Business District. In fact, the SXSW Defendants were aware of the existence of and had access to water-filled rigid barriers because such barriers were used as a traffic control measure on 7th Street to channel traffic into a garage. Proper traffic control measures would have been easily set up and taken down, even in an emergency situation. Water-filled rigid barriers can be sufficiently drained and moved by one person in less than one minute to allow for access of emergency vehicles. Moreover, a hand-operated pallet jack operator could be assigned at a *de minimus* cost to key intersections or access points where the need for such access is anticipated because of the proximity to a hospital or firehouse or emergency medical station.

### 2. Breach - The SXSW Defendants breached their duty to William.

119. The SXSW Defendants failed to utilize adequate traffic control measures to protect attendees who were pedestrians or bicyclists. Ordinary, prudent festival organizers and ordinary, prudent traffic design consultants would have deployed rigid barricades to prevent errant vehicles from colliding with festival attendees. In addition, Defendants failed to follow the highest standard of care. Very cautious and prudent festival organizers and traffic design consultants would have deployed rigid barricades to prevent errant vehicles from colliding with festival attendees.

Unofficial copy Travis Co. District Clerk Velva L. Price

39

120.    Because the SXSW Defendants failed to exercise the care of an ordinarily prudent festival organizer and of an ordinarily prudent traffic design consultant or that of a very cautious and prudent festival organizer or of a very cautious and prudent traffic design consultant the SXSW Defendants breached the duty they owed SXSW festival attendees such as and including William.

3. **Proximate Cause - The SXSW Defendants' failure to exercise ordinary care proximately caused injuries to William.**

a. *The SXSW Defendants' failure to exercise ordinary care to prevent an errant vehicle collision was a substantial factor in causing injuries to William.*

121.    The inadequate traffic control measures deployed by the SXSW Defendants were a substantial factor in bringing about William's injuries because the use of proper traffic control measures, such as but not limited to rigid barriers, would have prevented an errant vehicle from penetrating the area closed at Red River and 9th Street.  Had an errant vehicle not been able to so easily penetrate the SXSW festival venue on Red River Street between 9th and 11th Streets, an errant vehicle would not have collided with William and several others.

b. *But for the SXSW Defendants' failure to exercise ordinary care, William would not have been injured.*

122.    But for the SXSW Defendants' failure to exercise ordinary care by deploying adequate traffic control measures to keep traffic out of the festival venue on Red River Street between 9th and 11th Streets, an errant vehicle would not have been able to penetrate the venue space at 9th and Red River Street, nor would an errant vehicle have been able to progress past 10th Street on Red River Street if proper measures had been deployed at that intersection. But for the SXSW Defendants to utilize and deploy appropriate traffic control measures, William would not have been injured.

40

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

### c. An errant vehicle collision on Red River during SXSW was foreseeable.

123. A collision between an errant vehicle and pedestrians and bicyclists in and around the SXSW festival venue located in the middle of a city block inside the Central Business District while live lanes of traffic were active around and through the venue was foreseeable to the SXSW Defendants.

124. A festival organizer and a traffic design consultant of ordinary intelligence would have anticipated the danger created by inadequate traffic control measures posed by errant vehicles, including errant vehicles operated by intoxicated persons.

125. Defendants knew or should have known that the risk of an errant vehicle incident was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas—such as the 2003 Santa Monica Farmer's Market crash, the 2012 Austin Hike and Bike Trail, and the 2013 Venice Beach boardwalk crash—have resulted in serious injuries and deaths. These previous errant vehicle incidents made the incident of March 13, 2014 at the SXSW festival readily foreseeable.

126. Moreover, SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles and SXSW purposefully designed the festival so that pedestrians and attendees on bicycles were forced to congregate in and travel through areas immediately bordered by live lanes of traffic. In fact, this was an aspect of the festival that SXSW boasted was unique. SXSW recognized the risk posed by traffic and took steps—albeit negligent and inadequate steps—to close streets to traffic in light of that risk using simple signage.

127. Furthermore, public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival is a well documented fact through both the elevated number of arrests each year during the festival and because of the media's coverage of the issue. Thus the general danger to a festivalgoer such as and including William from an errant vehicle driven by an intoxicated person was also foreseeable.

128. Similarly, the general danger of serious bodily injury or death from an errant vehicle to a festivalgoer such as and including William in and around the SXSW festival was foreseeable to the SXSW Defendants. Similarly, the general danger to William from an errant vehicle driven by an intoxicated person in and around the SXSW festival was foreseeable.

129. The general character of the injury could be reasonably anticipated by the SXSW Defendants in light of the serious injuries and deaths that resulted from similar prior incidents including the Santa Monica Farmer's Market crash, the Venice Beach Boardwalk crash, and the Austin Hike and Bike Trail collision. Each of these incidents caused serious bodily injuries and deaths from the impact of a moving motor vehicle colliding with pedestrians and cyclists. Because foreseeability of a danger does not require that the exact sequence of events that produced the harm be predicted, the widespread and recurring incidents of errant vehicle crashes nationally, the high profile nature of some of them such as the Santa Monica Farmer's Market crash that killed 10 and injured 63—18 seriously, and the serious injury and death that occurred as a result of an errant vehicle crash in Austin on the Hike and Bike Trail in the Central Business District a mere two years before the 2014 SXSW crash all make the danger that an errant vehicle might penetrate the perimeter of closed street hosting part of the SXSW festival a foreseeable and predictable event.

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

130. William was a festivalgoer who was injured quite close to where the SXSW Defendants failed to deploy rigid barriers that would have prevented the errant vehicle from penetrating the perimeter of Red River Street at 9th Street, proceeding north on Red River, and colliding with William.

131. Because William's injuries were foreseeable and the SXSW Defendants' negligence was a substantial factor in William injuries and but for their negligence, the SXSW defendants are liable in negligence for the damages to Plaintiff.

**4. Gross Negligence – The SXSW Defendants were grossly negligent.**

132. The SXSW Defendants' decision to deploy inadequate traffic control measures involved an extreme degree of risk given the foreseeability and probability of an errant vehicle incident and the magnitude of potential harm from such an incident.

133. Defendants had actual awareness of the risk of a collision between an errant vehicle and a pedestrian or bicycling attendee but nonetheless proceeded with conscious indifference to the safety and welfare of the festival attendees. Defendants had actual awareness that such a collision would result in serious bodily injury or death.

134. These allegations are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

**Count 2. Negligence by the City of Austin**

135. Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 2.

Unofficial copy Travis Co. District Clerk Velva L. Price

**1. The City of Austin performed a proprietary function by sponsoring the SXSW festival.**

136.    Governmental immunity does not protect Texas municipalities when they perform proprietary acts. A proprietary act is one performed by a municipality at its discretion primarily for the benefit of those within its corporate limits rather than the general public. Because the City of Austin funded, maintained, sponsored, and/or operated the SXSW festival for the benefit of among others, the SXSW Defendants and Austin's hospitality and entertainment business communities, the City of Austin was engaged in a proprietary act and can be found liable to Plaintiff for negligence. Because the City of Austin did not fund, maintain, sponsor, and/or operate the festival for the benefit of the general public, the City of Austin was engaged in a proprietary act and can be found liable to Plaintiff for negligence. In its capacity as a sponsor of the SXSW festival, the City of Austin was acting under its proprietary function as opposed to its governmental function.

**2. Duty – The City of Austin owed William a duty to exercise reasonable care to avoid a foreseeable risk.**

*a. The risk was an errant vehicle.*

137.    A special event such as the SXSW music festival that was to take place in the middle of an urban central business district surrounded and crisscrossed by live traffic was especially vulnerable to the risk posed by an errant vehicle. The risk was that an errant vehicle would penetrate the perimeter of the festival zone that had been cordoned off for pedestrians and cyclists. Any collision between an errant vehicle and a pedestrian or bicyclist is likely to result in serious injury or death to the pedestrian or bicyclist.

*b. The risk of an errant vehicle was foreseeable.*

138.     Foreseeability of a danger does not require that the exact sequence of events that produced the harm be predicted. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992); *Mellon Mortgage Co. v. Holder*, 5 S.W3d 654, 655 (Tex. 1999). It simply requires that the general danger be foreseeable. The general danger of an errant vehicle penetrating the perimeter of the festival zone and colliding with and injuring or killing festivalgoers was or should have been foreseeable to the City of Austin. Defendant knew or should have known that the risk of an errant vehicle incident was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas—such as the 2003 Santa Monica Farmer's Market crash, the 2012 Austin Hike and Bike Trail, and the 2013 Venice Beach boardwalk crash—have resulted in serious injuries and deaths. These previous errant vehicle incidents made the incident of March 13, 2014 at the SXSW festival readily foreseeable. Moreover, Austin/Travis County EMS released a response to an incident where a vehicle plowed into a crowd of SXSW festival goers less than a month before the incident in this case.

139.     The City of Austin also knew that SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles and SXSW purposefully designed the festival so that pedestrians and attendees on bicycles were forced to congregate in and travel through areas immediately bordered by live lanes of traffic. In fact, this was an aspect of the festival that SXSW boasted was unique and the City of Austin knew this.

140.     The City of Austin recognized the risk posed by traffic and took steps—albeit negligent, inadequate, and negligently implemented steps—to close streets to traffic in light of that risk using simple signage.

45

141. Furthermore, public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival is a well documented fact through both the elevated number of arrests each year during the festival and because of the media's coverage of the issue. The City of Austin had actual knowledge of the 171 drunk driving arrests that occurred during the five preceding SXSW festivals in or immediately adjacent to the SXSW festival zone. Thus the general danger to a festivalgoer such as and including William from an errant vehicle driven by an intoxicated person was also foreseeable to the City of Austin.

142. Similarly, the general danger of serious bodily injury or death from an errant vehicle to a festivalgoer such as and including William in and around the SXSW festival was foreseeable to the City of Austin. Similarly, the general danger to William from an errant vehicle driven by an intoxicated person in and around the SXSW festival was foreseeable.

143. The general character of the injury could be reasonably anticipated by the City of Austin in light of the serious injuries and deaths that resulted from similar prior incidents including the Santa Monica Farmer's Market crash, the Venice Beach Boardwalk crash, and the Austin Hike and Bike Trail collision. Each of these incidents caused serious bodily injuries and deaths from the impact of a moving motor vehicle colliding with pedestrians and cyclists. Because foreseeability of a danger does not require that the exact sequence of events that produced the harm be predicted, the widespread and recurring incidents of errant vehicle crashes nationally, the high profile nature of some of them such as the Santa Monica Farmer's Market crash that killed 10 and injured 63 (18 seriously), the October 2012 errant vehicle incident on Sixth Street in downtown Austin, the City of Austin's 2012 Traffic Fatality Report, and the serious injury and death that occurred as a result of an errant vehicle crash that occurred on the Austin Hike and Bike Trail a mere two years before the 2014 SXSW crash all make the danger

46

of an errant vehicle breaching closed streets hosting the SXSW festival a foreseeable and predictable event.

144. Finally, where the injured person is situated close to the wrongful act, his or her injury is all the more foreseeable. William was a festivalgoer who was injured mere feet from where the City of Austin failed to deploy rigid barriers (in addition to negligently implementing the Traffic Control Plan) that would have prevented the errant vehicle from penetrating the perimeter of the festival zone at Red River Street and 9th Street.

### c. The risk of an errant vehicle posed a likelihood of injury.

145. The likelihood of serious injury or death resulting from a collision between a moving vehicle and a pedestrian or cyclist is self evident. In addition, the reality that serious injury and death will result from an errant vehicle incident is well documented and publicized. The 18 serious injuries and 10 deaths that occurred as a result of the 2003 Santa Monica Farmer's Market Crash and the serious injuries to one individual and the death of another individual as a result of the 2012 Austin Hike and Bike Trail errant vehicle collision underscore the likelihood that injuries, including William's, would occur as a result of the errant vehicle collision with pedestrians and cyclists on March 13, 2014 at the SXSW Festival on Red River Street between 9th and 11th streets.

### d. The City of Austin possessed superior knowledge of the risk of an errant vehicle.

146. The City of Austin had superior knowledge of the risk and general danger posed to festivalgoers such as and including William from errant vehicle collisions because the festival has taken place in the City of Austin for 27 years and the City of Austin has decades of experience responding to errant vehicle incidents.

### e. The Risk-Utility Test factors weigh in favor of placing a duty to act with reasonable care on the City of Austin.

147. The City of Austin was in a better position than festival attendees to ensure that proper traffic control measures were properly deployed to protect pedestrians and bicyclists who were SXSW festival attendees such as William because the duty is more easily and reasonably borne by the City of Austin. The consequences of placing the duty to take steps to protect pedestrians and cyclists attending the SXSW festival would simply require the City of Austin to mandate and deploy adequate traffic control measures and the practical reality and the financial cost of doing so is *de minimus* given the tens of millions of dollars in revenue that the festival generates each year for SXSW, its owners, and the City of Austin's hospitality and entertainment business communities. Proper traffic control measures to separate moving vehicles from pedestrians, including rigid barriers are so widely available and used throughout Austin's Central Business District that they are a ubiquitous site at virtually every temporary street closure for construction in the Central Business District. Proper traffic control measures would have been easily set up and taken down, even in an emergency situation. Water-filled rigid barriers can be sufficiently drained and moved by one person in less than one minute to allow for access of emergency vehicles. Moreover, a hand-operated pallet jack operator could be assigned at a *de minimus* cost to key intersections or access points where the need for such access is anticipated because of the proximity to a hospital or firehouse or emergency medical station. A person operating a pallet jack can easily move a water-filled barrier in a few seconds to allow emergency access.

### 3. Breach – The City of Austin breached its duty to William.

148. City of Austin failed to utilize adequate traffic control measures to protect attendees who were pedestrians or bicyclists. Ordinary, prudent festival organizers would have

48

deployed rigid barricades to prevent errant vehicles from colliding with festival attendees. The City of Austin failed to implement the Traffic Control Plan. Ordinary, prudent festival organizers would have implemented the Traffic Control Plan. In addition, the City of Austin failed to follow the highest standard of care. Very cautious and prudent festival organizers would have deployed rigid barricades to prevent errant vehicles from colliding with festival attendees. Very cautious and prudent festival organizers would have implemented the Traffic Control Plan.

149.    Because the City of Austin failed to exercise the care of an ordinarily prudent festival organizer or that of a very cautious and prudent festival organizer, the City of Austin breached the duty they owed SXSW festival attendees such as and including William.

### 4. Proximate Cause - The City of Austin's failure to exercise ordinary care proximately caused William's injuries.

#### a. The City of Austin's failure to exercise ordinary care to prevent an errant vehicle collision was a substantial factor in causing William's injuries.

150.    The inadequate traffic control measures deployed by the City of Austin and the negligent implementation of the Traffic Control Plan by the City of Austin were substantial factors in bringing about William's injuries because the use of proper traffic control measures, such as but not limited to rigid barriers, would have prevented an errant vehicle from penetrating the area closed at Red River and 9th Street. Had an errant vehicle not been able to so easily penetrate the SXSW festival venue on Red River Street between 9th and 11th Streets, an errant vehicle would not have collided with William, and William would not have been injured from the impact.

#### b. But for the City of Austin's failure to exercise ordinary care, William would not have been injured by an errant vehicle.

151.	But for the City of Austin's failure to exercise ordinary care by deploying adequate traffic control measures to keep traffic out of the festival venue on Red River Street between 9th and 11th Streets, an errant vehicle would not have been able to penetrate the venue space at 9th and Red River Street, nor would an errant vehicle have been able to progress past 10th Street on Red River Street if proper measures had been deployed at that intersection. But for the City of Austin's failure to utilize and deploy appropriate traffic control measures, William would not have been injured.

### c.	An errant vehicle collision on Red River during SXSW was foreseeable.

152.	A collision between an errant vehicle and pedestrians and bicyclists in and around the SXSW festival venue located in the middle of a city block inside the Central Business District while live lanes of traffic were active around and through the venue was foreseeable to the City of Austin.

153.	A festival organizer of ordinary intelligence would have anticipated the danger created by inadequate traffic control measures posed by errant vehicles, including errant vehicles operated by intoxicated persons.

154.	The City of Austin knew or should have known that the risk of an errant vehicle incident was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas—such as the 2003 Santa Monica Farmer's Market crash, the 2012 Austin Hike and Bike Trail, and the 2013 Venice Beach boardwalk crash—have resulted in serious injuries and deaths. These previous errant vehicle incidents made the incident on March 13, 2014 at the SXSW festival readily foreseeable.

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

155.     Moreover, The City of Austin knew that SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles and knew that SXSW purposefully designed the festival so that pedestrians and attendees on bicycles were forced to congregate in and travel through areas immediately bordered by live lanes of traffic. In fact, the City of Austin knew that this was an aspect of the festival that SXSW boasted was unique. The City of Austin recognized the risk posed by traffic and took steps—albeit negligent and inadequate steps—to close streets to traffic in light of that risk using simple signage.

156.     Furthermore, public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival is a well documented fact through both the elevated number of arrests each year during the festival and because of the media's coverage of the issue. Thus the general danger to a festivalgoer such as and including William from an errant vehicle driven by an intoxicated person was also foreseeable.

157.     Similarly, the general danger of serious bodily injury or death from an errant vehicle to a festivalgoer such as and including William in and around the SXSW festival was foreseeable to the City of Austin. Similarly, the general danger to William from an errant vehicle driven by an intoxicated person in and around the SXSW festival was foreseeable.

158.     The general character of the injury could be reasonably anticipated by the City of Austin in light of the serious injuries and deaths that resulted from similar prior incidents including the Santa Monica Farmer's Market crash, the Venice Beach Boardwalk crash, and the Austin Hike and Bike Trail collision. Each of these incidents caused serious bodily injuries and deaths from the impact of a moving motor vehicle colliding with pedestrians and cyclists. Because foreseeability of a danger does not require that the exact sequence of events that

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**

produced the harm be predicted, the widespread and recurring incidents of errant vehicle crashes nationally, the high profile nature of some of them such as the Santa Monica Farmer's Market crash that killed 10 and injured 63—18 seriously, and the serious injury and death that occurred as a result of an errant vehicle crash in Austin on the Hike and Bike Trail in the Central Business District a mere two years before the 2014 SXSW crash all make the danger that an errant vehicle might penetrate the perimeter of closed street hosting part of the SXSW festival a foreseeable and predictable event.

159. William was a festivalgoer who was injured mere feet from where the City of Austin failed to deploy rigid barriers that would have prevented the errant vehicle from penetrating the perimeter of Red River Street at 9th Street, proceeding north on Red River, and colliding with William

160. Because William's injury was foreseeable and the City of Austin's negligence was a substantial factor in William's injury and but for their negligence he would not have been injured, the City of Austin is liable in negligence for the damages to Plaintiff.

**5. Gross Negligence - The City of Austin was grossly negligent.**

161. The City of Austin's decision to deploy inadequate traffic control measures involved an extreme degree of risk given the foreseeability and probability of an errant vehicle incident and the magnitude of potential harm from such an incident. The City of Austin's decision to not implement the Traffic Control Plan involved an extreme degree of risk given the foreseeability and probability of an errant vehicle incident and the magnitude of potential harm from such an incident.

162. The City of Austin had actual awareness of the risk of a collision between an errant vehicle and a pedestrian or bicycling attendee but nonetheless proceeded with conscious

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

indifference to the safety and welfare of the festival attendees. The City of Austin had actual awareness that such a collision would result in serious bodily injury or death.

163. These allegations are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

**Count 3. Negligence Per Se by the SXSW Defendants**

164. Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 3.

### 1. The City of Austin Ordinance governing temporary street closures for festivals was designed to protect William.

165. City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Events, requires applicants for events that will close streets to comply with applicable rules. [52] Defendants' Right-of-Way permit issued under the Ordinance required compliance with state, local, and industry standards. William was among the 40,000 participants for whom the application for the right-or-way permit was requested by Defendants. Thus, William belonged in the class of persons for whom the Ordinance governing temporary street closures for events was designed to protect.

### 2. Tort liability may be imposed under the Ordinance governing temporary street closures for festivals.

166. Civil liability under City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Events, is consistent with Council's intent to require applicants for Right-of-Way permits to conform to reasonable standards of care. In addition, the Ordinance requires

---

[52] City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Events, attached as **exhibit 32**.

*William Josma v. SXSW,* Plaintiff's First Amended Petition

mandatory conduct. Finally, Defendants had no excuse for noncompliance with the Ordinance given that Defendants had knowledge of the Ordinance and were capable of compliance.

**3. The SXSW Defendants' violation of the Ordinance proximately caused William's injuries.**

167. The inadequate traffic control measures deployed by Defendants in violation of City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Events, were a substantial factor in bringing about William's injuries. If Defendants' traffic control measures had been in compliance with City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Events, William would not have been injured. But for the noncompliance with City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Event, William would not have been injured.

168. A festival organizer or traffic design consultant of ordinary intelligence would have anticipated the danger created by noncompliance with City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Events. Defendants knew or should have known that the risk of an errant vehicle incident was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas—such as the 2003 Santa Monica Farmer's Market crash, the 2012 Austin Hike and Bike Trail, and the 2013 Venice Beach boardwalk crash—have resulted in serious injuries and deaths. These previous errant vehicle incidents made the incident of March 13, 2014 at the SXSW festival readily foreseeable.

169. Moreover, SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles and SXSW purposefully designed the festival so that pedestrians and attendees on bicycles were forced to congregate in

54

and travel through areas immediately bordered by live lanes of traffic. In fact, this was an aspect of the festival that SXSW boasted was unique.

170. SXSW recognized the risk posed by traffic and took steps—albeit negligent and inadequate steps—to close streets to traffic in light of that risk using simple signage.

171. Furthermore, public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival is a well documented fact through both the elevated number of arrests each year during the festival and because of the media's coverage of the issue. Thus the general danger to a festivalgoer such as and including William from an errant vehicle driven by an intoxicated person was also foreseeable.

172. Thus, the general danger of serious bodily injury or death from an errant vehicle to a festivalgoer such as and including William in and around the SXSW festival was foreseeable to the SXSW Defendants. Similarly, the general danger to William from an errant vehicle driven by an intoxicated person in and around the SXSW festival was foreseeable.

173. The general character of the injury could be reasonably anticipated by the SXSW Defendants in light of the serious injuries and deaths that resulted from similar prior incidents including the Santa Monica Farmer's Market crash, the Venice Beach Boardwalk crash, and the Austin Hike and Bike Trail collision. Each of these incidents caused serious bodily injuries and deaths from the impact of a moving motor vehicle colliding with pedestrians and cyclists. Because foreseeability of a danger does not require that the exact sequence of events that produced the harm be predicted, the widespread and recurring incidents of errant vehicle crashes nationally, the high profile nature of some of them such as the Santa Monica Farmer's Market crash that killed 10 and injured 63—18 seriously, and the serious injury and death that occurred as a result of an errant vehicle crash in Austin on the Hike and Bike Trail in the Central Business

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

District a mere two years before the 2014 SXSW crash all make the danger that an errant vehicle might penetrate the perimeter of closed street hosting part of the SXSW festival a foreseeable and predictable event.

### 4. Gross Negligence - The SXSW Defendants were grossly negligent.

174. The SXSW Defendants' decision to deploy inadequate traffic control measures involved an extreme degree of risk given the foreseeability and probability of an errant vehicle incident and the magnitude of potential harm from such an incident.

175. Defendants had actual awareness of the risk of a collision between an errant vehicle and a pedestrian or bicycling attendee but nonetheless proceeded with conscious indifference to the safety and welfare of the festival attendees. Defendants had actual awareness that such a collision would result in serious bodily injury or death.

176. These allegations are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

### Count 4. Negligent Voluntary Undertaking by the SXSW Defendants

177. Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 4.

### 1. The SXSW Defendants owed a legal duty to William.

178. The SXSW Defendants voluntarily undertook to provide a service that they knew or should have known was necessary for the public's protection. The SXSW Defendants voluntarily applied for street closures to protect festival attendees from traffic. The SXSW Defendants knew or should have known that proper deployment of adequate traffic control measures was necessary in order to protect the 40,000 attendees including William because it was foreseeable that an errant vehicle incident could happen.

56

*William Josma v. SXSW*, Plaintiff's First Amended Petition

179. The SXSW Defendants knew or should have known that the risk of an errant vehicle incident was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas—such as the 2003 Santa Monica Farmer's Market crash, the 2012 Austin Hike and Bike Trail, and the 2013 Venice Beach boardwalk crash—have resulted in serious injuries and deaths. These previous errant vehicle incidents made the incident of March 13, 2014 at the SXSW festival readily foreseeable.

180. Moreover, SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles and SXSW purposefully designed the festival so that pedestrians and attendees on bicycles were forced to congregate in areas immediately bordered by live lanes of traffic. In fact, this was an aspect of the festival that SXSW boasted was unique.

181. SXSW recognized the risk posed by traffic and took steps—albeit negligent and inadequate steps—to close streets to traffic in light of that risk using simple signage.

182. Furthermore, public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival is a well documented fact through both the elevated number of arrests each year during the festival and because of the media's coverage of the issue. Thus the general danger to a festivalgoer such as and including William from an errant vehicle driven by an intoxicated person was also foreseeable.

183. Thus, the general danger of serious bodily injury or death from an errant vehicle to a festivalgoer such as and including William in and around the SXSW festival was foreseeable to the SXSW Defendants. Similarly, the general danger to William from an errant vehicle driven by an intoxicated person in and around the SXSW festival was foreseeable.

57

184. The general character of the injury could be reasonably anticipated by the SXSW Defendants in light of the serious injuries and deaths that resulted from similar prior incidents including the Santa Monica Farmer's Market crash, the Venice Beach Boardwalk crash, and the Austin Hike and Bike Trail collision. Each of these incidents caused serious bodily injuries and deaths from the impact of a moving motor vehicle colliding with pedestrians and cyclists. Because foreseeability of a danger does not require that the exact sequence of events that produced the harm be predicted, the widespread and recurring incidents of errant vehicle crashes nationally, the high profile nature of some of them such as the Santa Monica Farmer's Market crash that killed 10 and injured 63—18 seriously, and the serious injury and death that occurred as a result of an errant vehicle crash in Austin on the Hike and Bike Trail in the Central Business District a mere two years before the 2014 SXSW crash all make the danger that an errant vehicle might penetrate the perimeter of a closed street hosting part of the SXSW festival a foreseeable and predictable event.

### 2. The SXSW Defendants breached their legal duty to William

185. Defendants failed to utilize adequate traffic control measures to protect pedestrians and attendees on bicycles from errant vehicles. Ordinary, prudent festival organizers and ordinary, prudent traffic design consultants would have deployed rigid barricades to prevent errant vehicles from colliding with festival attendees.

### 3. The SXSW Defendants' negligent performance of their voluntary undertaking increased William's risk of harm.

186. Defendants' negligent performance of their voluntary undertaking to close streets increased William's risk of harm because it made him less likely to expect and ride his bicycle defensively for a vehicle coming from the cordoned-off streets.

### 4. William relied on the SXSW Defendants' traffic control measures.

187. Like any ordinary and reasonable festival attendee, William relied on Defendants' performance of their voluntary undertaking to close streets for his safety while attending the festival. Like any ordinary and reasonable festival attendee, William assumed that having applied to close streets and received the proper Right-of-Way permits, Defendants' would adequately deploy traffic control measures to deter errant vehicles and protect festival attendees.

### 5. The SXSW Defendants' negligence proximately caused A.Z's injuries.

188. The SXSW Defendants' negligence in adopting inadequate traffic control measures to close the streets to protect festival attendees from traffic was a substantial factor that caused A.Z's injuries because but for the inadequate traffic control measures the SXSW Defendants used to close Red River Street between 9th and 11th Streets, an errant vehicle would not have been able to penetrate the ostensibly closed section of Red River and collide with William.

189. The incursion of an errant vehicle, particularly one operated by an intoxicated person, into the cordoned off section of Red River Street at 9th Street was a foreseeable event because there are approximately 20,000 errant vehicle collisions annually. Moreover, there have been numerous high profile errant vehicle collisions in and around sections of streets that are temporarily closed for pedestrian events such as farmer's markets, including the 2003 Santa Monica Farmer's Market collision that left 10 people dead and 18 seriously injured. That errant vehicle was not driven by an intoxicated person but was otherwise similar to the incident that occurred on March 13, 2014 at the SXSW Music Festival on Red River Street between 9th and 11th Streets. Because of the high number of arrests for driving while intoxicated during SXSW in the Central Business District each year, for at least the last five years preceding the 2014

59

SXSW Music Festival, SXSW knew or should have known of the risk that intoxicated persons were operating motor vehicles in the immediate vicinity of the section of Red River that the SXSW Defendants possessed and to where it invited pedestrians and bicyclists to congregate.

### 6. Gross Negligence – The SXSW Defendants were grossly negligent.

190. The SXSW Defendants' decision to deploy inadequate traffic control measures involved an extreme degree of risk given the foreseeability and probability of an errant vehicle incident and the magnitude of potential harm from such an incident.

191. Defendants had actual awareness of the risk of a collision between an errant vehicle and a pedestrian or bicycling attendee but nonetheless proceeded with conscious indifference to the safety and welfare of the festival attendees. Defendants had actual awareness that such a collision would result in serious bodily injury or death.

192. These allegations are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

### Count 5. Premises Liability of the SXSW Defendants

193. Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 5.

### 1. The SXSW Defendants were the temporary occupiers of the premises at the time of the incident.

194. Defendants had a City of Austin Right-of-Way permit that made it the legal occupier of Red River Street between 9th Street and 11th Street. Defendants' Right-of-Way permit gave them legal control over Red River Street between 9th Street and 11th Street. Thus Defendants were the occupiers of the premises encompassing Red River Street between 9th

Street and 11th Street. As the occupier of the premises SXSW owed William a duty of care to keep the premises in a reasonably safe condition.

**2. The condition created by the SXSW Defendants' failure to deploy adequate traffic control measures posed an unreasonable risk of harm to festivalgoers.**

195. Traffic control measures that were inadequate to prevent errant vehicles—including an errant vehicle operated by an intoxicated driver—from penetrating the section of Red River that SXSW intended to close to vehicular traffic posed an unreasonable risk of harm to festivalgoers including William. A music festival that is deliberately held in a central business district of a metropolitan city surrounded with and crisscrossed by live lanes of traffic without deploying traffic control measures sufficient to prevent an errant vehicle from colliding with pedestrians who are congregating in and coming or going from a designated venue under the festival operator's control poses an unreasonable risk of harm to persons the festival has invited into the premises.

196. SXSW required festival attendees, including William, to enter the venue zone.. By doing so without deploying adequate traffic control measures to prevent an errant vehicle from breaching the venue zone created an unreasonable risk of harm from errant vehicle collisions with pedestrians and bicyclists.

**3. The SXSW Defendants had actual knowledge of the dangerous condition.**

197. Because SXSW deliberately established a venue on Red River Street and people to attend the venue and congregate in the street while at the same time implementing traffic control measures it knew were inadequate to prevent an errant vehicle from penetrating the venue zone and simultaneously failing to deploy traffic control measures that would be sufficient

61

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

to stop an errant vehicle from penetrating the venue zone, the SXSW Defendants had actual knowledge of the dangerous condition that it had created.

### 4. The SXSW Defendants knew or should have known the dangerous condition posed an unreasonable risk to William.

198. The SXSW Defendants knew or should have known that the traffic control plan and the traffic control measures were inadequate for their intended purpose because the occurrence of collisions between errant vehicles and pedestrians in locations adjacent to live lanes of traffic is well documented and well known, particularly to traffic control professionals. In addition, SXSW has been engaged in hosting this festival in substantially the same format—in and around the streets of Austin's Central Business District and in and adjacent to bars and other music venues—for 27 years.

199. Defendants knew or should have known that an errant vehicle collision was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. Any collision between an errant vehicle and a pedestrian or bicyclist is likely to result in serious injury or death. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas such as the Santa Monica Farmer's Market, the Venice Beach boardwalk, and the Austin Hike and Bike Trail have resulted in serious injuries and deaths. Thus the general danger to William from an errant vehicle was foreseeable.

200. Public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival are well-known facts both because of the elevated number of arrests each year during SXSW in the Central Business District where the Festival takes place and because of the media's coverage of the issue. Thus the danger to William from an errant vehicle, including but certainly not limited to one, driven by an intoxicated person was foreseeable.

201. SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles. SXSW purposefully designed the festival so that pedestrians and attendees on bicycles would be forced to congregate in and travel through areas immediately bordered by live lanes of traffic. SXSW recognized the risks and took steps—however inadequate—to institute traffic control measures and close streets to traffic. The proper deployment of adequate traffic control measures including of rigid barriers is and has been obvious throughout Austin's Central Business District. Thus, the SXSW Defendants knew or should have known that attendees such as William who were placed in the immediate vicinity of inadequate traffic control measures were at risk of serious injury or death.

202. The consequences of placing the burden on SXSW to ensure that its festival attendees, including its invitees, are safe and secure while attending official festival events and patronizing festival venues is *de minimus* for an event that generates tens of millions of dollars in revenue each year for the festival operators.

203. Proper traffic control measures are widely available and widely used throughout Austin's Central Business District. Adequate traffic control measures would have been easily set up and taken down, even in an emergency situation. Water-filled rigid barriers can be drained in one minute and then moved by a single person. In addition, Defendants—being a festival promoter with 27 years' experience in holding a music festival in an urban, downtown Austin and traffic design consultants who's occupation it is to manage traffic around crowds—had superior knowledge of the general danger posed by errant vehicles.

204. The consequences of placing this burden on the SXSW Defendants will result in a safer environment for festival attendees and eliminate the risk of collisions between errant vehicles and festival attendees who are present in a given area to attend SXSW events.

63

205.    Therefore, the collision between the errant vehicle that penetrated the SXSW festival venue on Red River Street between 9th and 11th Streets, and the ensuing injuries and deaths that occurred, including the injuries of William, was foreseeable to the SXSW Defendants.

### 5. The SXSW Defendants breached their legal duty to William by failing to reduce, eliminate, or warn of the risk of an errant vehicle.

206.    The SXSW Defendants, as the temporary possessor of the premises, breached their legal duty to William by failing to exercise reasonable care to reduce or eliminate the risk of an errant vehicle or warn of the risk.

207.    SXSW—as temporary possessor of the premises—had the right and ability to propose, recommend, institute, and require that the traffic control plan and attendant traffic control measures were adequate to protect against the risk of an errant vehicle penetrating a SXSW festival zone. This includes the SXSW designated festival zone on Red River between 9th and 11th Streets. The SXSW Defendants included the 1000 block of Red River in the traffic control plan submitted to the city but failed to designate adequate traffic control measures to protect festival attendees, such as and including William, from sustaining bodily injury and death from a collision with an errant vehicle. As such, the SXSW Defendants failed to exercise reasonable care to reduce or eliminate the risk of an errant vehicle collision.

### 6. The SXSW Defendants' breach proximately caused William's injuries and the Plaintiff's damages.

208.    SXSW's failure to use reasonable care to reduce or eliminate the risk was a proximate cause of William's injuries. SXSW's failure to deploy adequate traffic control measures was the direct and but for cause-in-fact of William's injuries because readily available and commonly utilized rigid barricades would have stopped the errant vehicle from penetrating

64

*William Josma v. SXSW*, Plaintiff's First Amended Petition

the SXSW designated area. If the errant vehicle was prevented from penetrating the area designated by SXSW as part of its festival zone, the errant vehicle would not have collided with William on Red River Street. But for the SXSW Defendants' failure to exercise reasonable care to prevent errant vehicles from colliding with its festival attendees, including William, William would not have suffered injuries.

### Count 6. Public Nuisance by the SXSW Defendants

209.    Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 6.

#### 1.   The SXSW Defendants' conduct was a public nuisance.

210.    Defendants' negligence in deploying inadequate traffic control measures negatively affected the people of the City of Austin at large and the general population of festival attendees because many of the citizens of Austin and festival attendees were traumatized by the events surrounding the crash. Defendants' conduct in deploying inadequate traffic control measures was unreasonable because it interfered with public health and safety as well as the peace and comfort of the community, all of which the public has a right to without interference, by frightening and traumatizing the general public. In addition, the Defendants' failure to use traffic control measures that were adequate to prevent this errant vehicle crash caused the tax payers of Austin and Travis County to incur substantial financial costs associated with first responders and emergency medical services for the injured and killed. Defendants' negligence was therefore a public nuisance.

#### 2.   William has common-law standing to bring a public nuisance cause of action.

211.    William suffered a special harm that was substantial and different from the harm suffered by the general public of the City of Austin and by the general population of festival

attendees because he was injured and traumatized. Thus William has common-law standing to bring this cause of action.

212. These allegations are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

## Count 7. Negligent Hiring, Supervision, Training, and Retention by SXSW

213. Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 7.

### 1. Duty

214. SXSW hired Defendant Patrick Lowe, Defendant Transportation Design Consultants, traffic control personnel, and others to plan and implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures. There was an employer-employee relationship between SXSW (as employer) and Lowe, Transportation Design Consultants, traffic control personnel, and other as-yet-unknown personnel (as employees). Lowe, Transportation Design Consultants, traffic control personnel, and other as-yet-unknown personnel [hereinafter "employees"] were employees of and had an employee-employer relationship with SXSW whether they were independent contractors or were hired by SXSW in a more traditional sense as direct employees.

### 2. Breach

215. SXSW hired unqualified persons to plan and implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures. SXSW failed to use ordinary care to determine whether its employees were competent and qualified to be hired to plan and implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures. SXSW knew or should

have known that information regarding its employees' lack of qualifications would have caused a reasonable festival organizer not to hire those employees. For instance, SXSW knew or should have known that Patrick Lowe was not a licensed Civil Engineer. SXSW knew or should have known that hiring these employees created a risk of harm to the public.

216. SXSW failed to use ordinary care to adequately supervise its employees as they planned and implemented its Traffic Control Plan and as they planned, implemented, oversaw, installed, manipulated, and uninstalled its traffic control measures.

217. SXSW failed to use ordinary care to adequately train its employees as they planned and implemented its Traffic Control Plan and as they planned, implemented, oversaw, installed, manipulated, and uninstalled its traffic control measures. A reasonably prudent festival organizer of a downtown, urban festival drawing tens or hundreds of thousands of attendees would have provided training beyond what SXSW provided to its employees.

218. SXSW failed to use ordinary care in retaining its employees because it failed to remain knowledgeable about its employees' competence and fitness to plan and implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures. SXSW knew or should have known that the continued employment of its unqualified employees to plan and implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures created an unreasonable risk of harm to others.

219. SXSW's employees were negligent in how they planned and implemented its Traffic Control Plan and as they planned, implemented, oversaw, installed, manipulated, and uninstalled its traffic control measures.

67

### 3. Proximate Cause

220.  SXSW's negligence in hiring, supervising, training, and retaining its employees was a substantial factor that caused William's injuries. But for the negligent hiring, supervision, training, and retention of SXSW's employees to plan and implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures, an errant vehicle would not have been able to penetrate the ostensibly closed section of Red River causing William's injuries.

221.  The incursion of an errant vehicle, particularly one operated by an intoxicated person, into the cordoned off section of Red River Street at 9th Street was a foreseeable event because there are approximately 20,000 errant vehicle collisions annually. Moreover, there have been numerous high profile errant vehicle collisions in and around sections of streets that are temporarily closed for pedestrian events such as farmer's markets, including the 2003 Santa Monica Farmer's Market collision that left 10 people dead and 18 seriously injured. That errant vehicle was not driven by an intoxicated person but was otherwise similar to the incident that occurred on March 13, 2014 at the SXSW Music Festival on Red River Street between 9th and 11th Streets. Because of the high number of arrests for driving while intoxicated during SXSW in the Central Business District each year, for at least the last five years preceding the 2014 SXSW Music Festival, SXSW knew or should have known of the risk that intoxicated persons were operating motor vehicles in the immediate vicinity of the section of Red River that the SXSW Defendants possessed and to where it invited pedestrians and bicyclists to congregate.

### 4. Gross Negligence

222.  SXSW's hiring, supervision, training, and retention of Defendant Patrick Lowe, Defendant Transportation Design Consultants, traffic control personnel, and others to plan and

68

implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures involved an extreme degree of risk given the foreseeability and probability of an errant vehicle incident and the magnitude of potential harm from such an incident.

223.    SXSW had actual awareness of the risk of a collision between an errant vehicle and a pedestrian or bicycling attendee but nonetheless proceeded with conscious indifference to the safety and welfare of the festival attendees in its hiring, supervision, training, and retention decisions. Defendants had actual awareness that such a collision would result in serious bodily injury or death.

These allegations are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

### Count 8. Negligence of Club 1808

224.    Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 8.

#### 1.  Duty – Club 1808 owed a legal duty to William.

225.    Defendant 1808 East 12th LLC d/b/a Club 1808 (hereinafter "Club 1808") had a legal duty to exercise ordinary care in serving and selling alcohol. Club 1808 had a legal duty to not provide alcohol to the obviously intoxicated Rashad Owens. Club 1808 had a legal duty to not provide a location for the obviously intoxicated Rashad Owens to drink alcohol and smoke marijuana.

### 2. Breach – Club 1808 breached its legal duty to William.

226. Club 1808 served and/or sold alcohol to Rashad Owens when he was obviously intoxicated and a clear danger to others. Club 1808 allowed Mr. Owens to drink alcohol and smoke marijuana on its premises when he was obviously intoxicated and a clear danger to others.

### 3. Causation – Club 1808's breach of it legal duty to William was a cause William's injury.

227. Rashad Owens's intoxicated driving was a substantial factor in bringing about William's injuries. Thus Club 1808's negligence in serving or selling alcohol to Mr. Owens and in allowing him to drink alcohol and smoke marijuana on its premises was a substantial factor in bringing about William's injuries.

### 4. Gross Negligence – Club 1808 was grossly negligent.

228. Club 1808's negligence involved an extreme degree of risk given the foreseeability and probability that it would cause serious bodily injury or death. William's injuries resulted from Club 1808's gross negligence. This entitles Plaintiff to exemplary damages.

229. These allegations are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

### Count 9. Negligent Entrustment by Andrew Bramwell

230. Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 9.

### 1. Duty – Andrew Bramwell owed a legal duty to William.

231. Defendant Andrew Bramwell had a legal duty to exercise ordinary care in entrusting his vehicle to another. Mr. Bramwell had a duty to ensure that his vehicle was

*William Josma v. SXSW*, **Plaintiff's First Amended Petition**

entrusted only to a driver that could safely operate the vehicle and drive reasonably and prudently.

### 2. Breach - Andrew Bramwell breached his legal duty to William.

232.    Defendant entrusted his vehicle to Rashad Owens knowing that Mr. Owens was intoxicated from alcohol and marijuana. Mr. Bramwell knew or should have known that Mr. Owens was not able to drive. Mr. Bramwell could have reasonably anticipated that entrusting his vehicle to Mr. Owens would result in injuries to others.

### 3. Causation - Andrew Bramwell's breach of his legal duty to William was a cause of William's injuries.

233.    Rashad Owens's negligent driving was a substantial factor in bringing about William's injuries. Thus Mr. Bramwell's negligent entrustment of his vehicle to the intoxicated Mr. Owens was a substantial factor in bringing about William's injuries.

### 4. Gross Negligence - Andrew Bramwell was grossly negligent.

234.    Mr. Bramwell's negligent entrustment of his vehicle to the intoxicated Mr. Owens involved an extreme degree of risk given the foreseeability and probability that it would cause serious bodily injury or death. William's injuries resulted from Mr. Bramwell's gross negligence. This entitles Plaintiff to exemplary damages.

235.    These allegations are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

### Count 10. Negligence by Rashad Owens

236.    Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 10.

71

## 1. Duty - Rashad Owens owed a legal duty to William.

237.     Defendant had a legal duty to exercise ordinary care and operate the vehicle he was driving reasonably and prudently because every driver has the duty to exercise ordinary care and operate his or her vehicle in a reasonable and prudent manner.

## 2. Breach - Rashad Owens breached his legal duty to William.

238.     Defendant failed to obey instructions from police officers, failed to obey traffic laws, failed to obey traffic control measures designed to deter vehicles, failed to timely apply his brakes, failed to maintain a proper lookout, failed to maintain proper control of the vehicle that he was driving, and failed to turn the vehicle to avoid colliding with pedestrians and bicyclists, including William.

## 3. Causation - Rashad Owens' breach of his legal duty to William. was a cause of William's injuries.

239.     Rashad Owens's negligent driving was a substantial factor in bringing about William's injuries. A person of ordinary intelligence would have anticipated the danger created by failing to obey instructions from police officers, failing to obey traffic laws, failing to obey traffic control measures designed to deter vehicles, failing to timely apply his brakes, failing to maintain a proper lookout, failing to maintain proper control of the vehicle that he was driving, and failing to turn the vehicle to avoid colliding with pedestrians and bicyclists. Owens' conduct as stated above was therefore a factor in causing William's injuries.

## 4. Gross Negligence - Rashad Owens was grossly negligent.

240.     Rashad Owens' failure to obey instructions from police officers, failure to obey traffic control measures designed to deter vehicles, failure to timely apply his brakes, failure to maintain a proper lookout, failure to  maintain proper control of the vehicle that he was driving,

and failure to turn the vehicle to avoid colliding with pedestrians and bicyclists involved an extreme degree of risk given the foreseeability and probability that a collision with a pedestrian or bicyclist would cause serious bodily injury or death.

241. Rashad Owens should have had actual awareness of the risk that serious injury or death could result from his failure to obey instructions from police officers, failure to obey traffic control measures designed to deter vehicles, failure to timely apply his brakes, failure to maintain a proper lookout, failure to maintain proper control of the vehicle that he was driving, and failure to turn the vehicle to avoid colliding with pedestrians and bicyclists.

242. These allegations are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

## VIII. DAMAGES

243. Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in this section on damages.

244. Plaintiff seeks recovery of damages within the jurisdictional limits of this Court, in an amount to be determined by jury.

245. Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in this section on damages.

246. In addition, the acts of Defendants as described were intentional, wanton, malicious, and oppressive, and thus entitle Plaintiff to an award of punitive damages.

## IX. DEMAND FOR JURY TRIAL

247. Plaintiff demands a trial by jury and is tendering the required jury fee simultaneously with the filing of this lawsuit.

73

## X. PRAYER

248.    WHEREFORE, Plaintiff respectfully prays that Defendants be duly cited to appear and answer herein, and that upon final trial of this cause, Plaintiff recover a judgment against Defendants for:

- Plaintiff's damages, as set forth above, in an amount within the jurisdictional limits of this Court, to be determined by a jury;

- Prejudgment interest on Plaintiff's damages as allowed by law;

- Interest on the judgment at the legal rate from date of judgment;

- Costs of court; and,

- Such other and further relief to which Plaintiff may be entitled.

March 15, 20156

Respectfully submitted,

/s/Scott M. Hendler

**Hendler Lyons Flores, PLLC**
1301 W. 25th Street, Suite 400
Austin, Texas 78705
Telephone: 512-439-3202
Facsimile: 512-439-3201
www.hendlerlaw.com

Scott M. Hendler
Texas Bar No. 09445500
shendler@hendlerlaw.com

Sean M. Lyons
Texas Bar No. 00792280
slyons@hendlerlaw.com

Rebecca Ruth Webber
Texas Bar No. 24060805
rwebber@hendlerlaw.com

*ATTORNEYS FOR PLAINTIFF*

74

*William Josma v. SXSW,* Plaintiff's First Amended Petition

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2016, I electronically filed the foregoing with the Clerk of Court which will send notification of such filing to all counsel of record. Defendant Rashad Owens will be served on March 16, 2016 via certified mail at the Texas Department of Criminal Justice, Connally Unit, 899 FM 632, Kenedy, Texas 78119.

/s/Scott M. Hendler
Scott M. Hendler

*William Josma v. SXSW,* **Plaintiff's First Amended Petition**